TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00569-CV







Gloria Dunn, Appellant



v.



Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 97-01921, HONORABLE PAUL DAVIS, JUDGE PRESIDING







 Appellant Gloria Dunn appeals from a decree terminating her parent-child
relationship with her three children and appointing appellee Texas Department of Protective and
Regulatory Services (the Department) permanent managing conservator. We will affirm the trial
court's judgment.


BACKGROUND

 Appellant married Michael Dunn in 1986. The couple had three children: N.J.D.,
born in June 1987; A.D., born in November 1988; and N.A.D., born in August 1994. On
February 12, 1997, Child Protective Services ("CPS") received a referral that A.D. had made an
outcry that her father had sexually abused her.(1) 

 CPS investigator Drew Lizcano went to the Dunn home to interview A.D. While
there, Lizcano spoke with Mr. Dunn on the phone and was verbally abused by him. After Mr.
Dunn threatened to assault Lizcano, the CPS investigator asked Mrs. Dunn to bring the children
to the CPS office where the two older children were interviewed separately. 

 CPS supervisor Randy Shell testified that while the children were being interviewed
at the CPS office, Mrs. Dunn confided in him that she was afraid to go home and that Mr. Dunn
had beaten her in the past. At trial Mrs. Dunn denied having said that Mr. Dunn had beaten her,
and Mr. Dunn testified that Mrs. Dunn had only feared that he would hurt the CPS workers rather
than her. Shell testified that a victim's counselor came in to speak to Mrs. Dunn about going to
a battered women's shelter. Shell also testified that when Mr. Dunn arrived at the CPS office, he
was very uncooperative and threatening. He cursed and paced, and several police officers arrived
to frisk him for weapons. Shell stated that later, after Mr. Dunn had calmed down, Mr. and Mrs.
Dunn spoke together privately, after which Mrs. Dunn told Shell that she was comfortable
returning home with her husband. 

 The next morning, February 13, Mrs. Dunn questioned A.D., who made an outcry
to her mother. A.D. confirmed that Mr. Dunn had sexually abused her. Mrs. Dunn testified that
she first contacted the bishop of her church and then called Mr. Dunn's cousin in Bastrop, who
offered to take care of the children. Mrs. Dunn left the children alone in the house to await the
cousin. That evening Mrs. Dunn also called a child-abuse hotline that referred her call to CPS. 
Tony Garcia was the CPS investigator who contacted Mrs. Dunn. She confirmed to him A.D.'s
allegations. Garcia testified that Mrs. Dunn indicated to him that she was afraid her husband knew
or would find out where the children were and that the children would be in jeopardy. Garcia
stated that he told Mrs. Dunn not to let Mr. Dunn have access to the children or know where they
were and to call the sheriff or 911 if Mr. Dunn came around the children. Mr. Dunn, however,
testified that Mrs. Dunn told him that the children were staying with his cousin. 

 The following day, Valentine's Day, Mrs. Dunn went to see the children at the
cousin's house. Mrs. Dunn testified that she and the cousin again questioned A.D. about the
abuse. The cousin testified by deposition that she and Mrs. Dunn both spoke with A.D. and that
Mrs. Dunn confirmed that A.D.'s story about her abuse on the fourteenth was consistent with what
she had said the day before. The cousin also testified that Mrs. Dunn left with her three children
because the cousin advised her to take A.D. to CPS to have her examined. Mrs. Dunn later
testified that she believed A.D. had been fed information, and that she did not like the way the
cousin was "interrogating" A.D. 

 Mrs. Dunn did not take the children to the child protection agency or have A.D.
examined. Instead, Mrs. Dunn took the children and returned home. Having received a report
of Mrs. Dunn's referral from Garcia, Randy Shell and Drew Lizcano arrived at the Dunn
residence in the early afternoon. Shell testified that Mrs. Dunn was very upset and crying. She
again confirmed A.D.'s statements concerning the abuse. Shell warned Mrs. Dunn not to let Mr.
Dunn have access to the children. Mrs. Dunn said that she was going to take the children to stay
at the cousin's house for the weekend. When Mrs. Dunn went to the cousin's house, she found
no one home and decided to take the children with her to pick up Mr. Dunn from work, despite
the many admonitions to keep him from having any contact with the children.

 On her way to pick up her husband, Mrs. Dunn stopped and called Shell from a pay
phone and asked him what she should do. Shell testified that he again told Mrs. Dunn not to allow
Mr. Dunn to have access to the children. He told Mrs. Dunn to call him back collect or to bring
the children to his office. Nevertheless, despite Shell's warnings of the danger, Mrs. Dunn took
the children with her, picked up Mr. Dunn, and they all returned home together. 

 When Mrs. Dunn did not call back or bring in the children, Shell and Lizcano went
to Mr. Dunn's workplace and were told that Mr. Dunn had already left with Mrs. Dunn and the
children. Shell testified that at that point he decided to remove the children because of Mrs.
Dunn's failure to protect the children by exposing them to an alleged sexual abuser. Because of
Mr. Dunn's behavior at the CPS office, Shell and Lizcano went to the police department to get
assistance in removing the children. Several police officers and at least one police dog
accompanied the CPS workers to the Dunn residence. When Shell told Mr. Dunn that he was
removing the children, Mr. Dunn threatened to kill himself. Using a warrant for a traffic
violation, the police arrested Mr. Dunn for his own protection. Shell testified that while he was
at the house, Mrs. Dunn told him that she believed Mr. Dunn had abused A.D. because she herself
had recently been raped by Mr. Dunn. At trial, Mrs. Dunn denied having made such a statement. 
From the time CPS removed the children, Mrs. Dunn began expressing doubt about the 
truthfulness of A.D. and her allegations. She continually stated her disbelief of the charges, never
expressing or demonstrating support for A.D., and instead supported her husband. 

 The Department initiated its suit to terminate the rights of both parents. After
attempts to reunite the family failed, the cause went to trial. The Dunns waived their right to a
jury, and in March 1998, the case was tried to the court, which found that Mr. and Mrs. Dunn had
both endangered the children as alleged and that termination was in the children's best interest. 
After Mrs. Dunn's motion for new trial was overruled, she brought appeal to this Court.(2) 


DISCUSSION

 In eight points of error, Mrs. Dunn contends that the evidence is legally and
factually insufficient to support the trial court's findings supporting termination; that the evidence
is factually insufficient to support the trial court's finding that the Department made all reasonable
efforts to reunite the children with the family; and that the trial court erred in excluding the
testimony of an undesignated expert as a rebuttal witness. 

 A court may terminate a parent-child relationship if it finds from clear and
convincing evidence that: (1) the parent has engaged in any of the specific conduct enumerated
in the Family Code as grounds for termination; and (2) termination is in the child's best interest. 
See Tex. Fam. Code Ann. § 161.001(1), (2) (West Supp. 2000); Texas Dep't of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976);
D.O. v. Texas Dep't of Human Servs., 851 S.W.2d 351, 352 (Tex. App.--Austin 1993, no writ). 
Here, the Department alleged and the trial court found that: (1) Mrs. Dunn knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that endangered their
physical or emotional well-being, see Tex. Fam. Code Ann. § 161.001(1)(D); (2) Mrs. Dunn
engaged in conduct, or knowingly placed her children with persons who engaged in conduct, that
endangered their physical or emotional well-being, see id. § 161.001(1)(E); and (3) termination
of her parental rights was in the children's best interest, see id. § 161.001(2). 

 Clear and convincing means the measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be
established. See In re G.M., 596 S.W.2d 846, 847 (Tex. 1980). On appeal, the appellant may
challenge both the legal and factual sufficiency of the evidence, and we review the finding in light
of the clear and convincing burden of proof at trial. See Leal v. Texas Dep't of Protective &
Regulatory Servs., No. 03-98-00516-CV, slip op. at 8 (Tex. App.--Austin, July 27, 2000, no pet.
history).

 In deciding a legal sufficiency challenge to an adverse finding on an issue on which
the appellant did not have the burden of proof, we consider only the evidence and inferences
tending to support the finding and disregard all evidence to the contrary. If more than a scintilla
of probative evidence supports the finding, it must be upheld. See Garza v. Alviar, 395 S.W.2d
821, 823 (Tex 1965); King's Estate, 244 S.W.2d at 661. In determining a factual sufficiency
challenge, we consider a neutral review of the evidence, both for and against the finding, and will
set aside the judgment only if the proof of the fact is so obviously weak or the finding so contrary
to the weight of the evidence as to be clearly wrong and unjust. See id., slip op. at 9 (citing Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v. Aviar, 395 S.W.2d 821, 823 (Tex. 1965)). 
We will not substitute our judgment for that of the trier of fact merely because we reach a different
conclusion. See Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196
(Tex. App.--Austin 1992, no writ).

 Our review of the record in this cause reveals acts of verbal, physical, and sexual
abuse by Mr. Dunn. But it also contains clear and convincing evidence reflecting that both
parents' actions created chaotic living conditions and that their conduct caused the children to live
in a home described by A.D. as "filled with family violence." Mrs. Dunn knowingly placed her
children in endangering conditions and allowed them to remain there; she knew of her husband's
violent and predatory conduct and yet she chose to place her children with him in this unhealthy
environment rather than remove them from the danger; she knowingly aligned herself with Mr.
Dunn thereby failing to protect her children despite warnings; and she declined to take advantage
of options extended to her that could enable her to remove the children from danger. 


Best Interest of the Children

 In her first two points of error, appellant complains that the evidence is legally and
factually insufficient to support the trial court's finding that termination was in the children's best
interest. Mrs. Dunn argues that only three witnesses were asked whether termination would be
in the children's best interest, and of these three witnesses, only one answered in the affirmative. 
But the test for whether termination is in the children's best interest does not depend on how
experts answer a global question. The Texas Supreme Court has enumerated numerous but not
exclusive factors a court may consider for determining when termination is in a child's best
interest:


(A) the desires of the child; (B) the emotional and physical needs of the child now
and in the future; (C) the emotional and physical danger to the child now and in the
future; (D) the parental abilities of the individuals seeking custody; (E) the
programs available to assist these individuals to promote the best interest of the
child; (F) the plans for the child by these individuals or by the agency seeking
custody; (G) the stability of the home or proposed placement; (H) the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and (I) any excuse of the acts or omissions of the
parent. 




Holley, 544 S.W.2d at 372 (footnotes omitted). A trial court is not required in each case to
consider all of these factors, and may consider other factors when appropriate. See id. The record
clearly contains evidence of several of the Holley factors.(3)
 


 Desires of the children 

 Christy Kuehn, an intake supervisor with Austin/Travis County MHMR Day Glo
Children's Services performed intake evaluations on N.J.D. and A.D. in March 1997. Kuehn
testified that both children expressed a desire to live with their mother but not their father. A.D.'s
therapist, Sherry Montgomery, testified that A.D. initially told her that she wanted to live with
her mother but not her father. Montgomery stated that later in therapy, A.D. told her that she
wanted to see her father but that she was still afraid of him and had formulated plans to prevent
his abusing her again if she returned to live with both parents. Psychologist David Poole
conducted evaluations of the two older children, in which both children expressed a desire to
return to their mother. Poole's evaluation of N.J.D. indicates that although the boy stated he was
willing to return home even if his father were there, N.J.D. was still afraid of his father. In sum,
the children had conflicting desires. They expressed the desire to return to Mrs. Dunn but were
equivocal and fearful about ever living with Mr. Dunn. Nevertheless, Mrs. Dunn continued living
with Mr. Dunn.


 Children's needs

 The evidence indicates that the children have special emotional and educational
needs. Poole diagnosed N.J.D. and A.D. as suffering from environmentally induced post-traumatic stress disorder ("PTSD"). Poole initially believed N.J.D. suffered from attention-deficit
disorder, but after a second evaluation, Poole determined that the child's agitation was the result
of his nervous condition. Poole recommended that the children be placed in an environment in
which they felt secure and safe and in which they would have a settled routine and receive pro-active nurturing and reassurance. In addition, N.J.D. has a learning disability and expressive
language problems stemming at least partially from the fact that he had been deaf for a period. 
Finally, the record indicates that A.D. had behavioral problems in school and was suspended at
the time the children were removed from their home.


 Mrs. Dunn's parental abilities

 Mrs. Dunn was largely responsible for taking care of the children, who seemed
physically healthy. However, Mr. Dunn testified that the deafness that had contributed to
N.J.D.'s speech problems resulted from fluid build up in his ear that the parents chose not to treat
with medical care. Appellant had allowed the children to miss a substantial amount of school,
contributing to their frequent truancy. Also, A.D.'s former principal testified that A.D. had been
suspended not only because of her bad and aggressive behavior but in an attempt to force the
parents to meet with school officials. The principal testified that Mrs. Dunn was hostile to their
efforts to help A.D. with her serious behavior problems and would tell A.D. things that
undermined the school's authority with the child. Mrs. Dunn was belligerent to school officials
and refused to allow them to refer A.D. for assistance. Christy Kuehn testified that Mrs. Dunn
recognized the need to protect her children but that Mrs. Dunn refused to acknowledge the sexual
abuse of her daughter. Randy Shell testified that Mrs. Dunn initially seemed capable of being
protective but that she chose to return the children to Mr. Dunn despite having been told
repeatedly for their safety not to allow him access. Mrs. Dunn admitted to leaving all the children
unsupervised for some time while awaiting Mr. Dunn's cousin on February 13 and also admitted
that she sometimes left the two older children--ages eight and nine at the time of removal--home
alone after school. 

 Mrs. Dunn's conduct during her supervised visits with the children added to their
anguish. The evidence reflects that Mrs. Dunn would sometimes have loud, angry tantrums,
screaming and arguing with CPS workers in front of the children to such an extent that the
children would become visibly upset, once causing them to cry and crawl under a table. At the
same time, Mrs. Dunn would not acknowledge that she was in any way responsible for the
children's extreme nervous condition or agitation. She sometimes left visits early or skipped them
altogether. Because Mrs. Dunn doubted the truth of A.D.'s allegations, she sided with her
husband and did not believe the children needed protection against him. Mrs. Dunn's own
therapist, Marcia Eyrich, admitted that Mrs. Dunn's disbelief of A.D.'s outcry was not an
appropriate parental response. She testified that it is important for children to believe that their
parents are protective of them. Mrs. Dunn's disbelief caused A.D. to suffer hurt, frustration, and
anguish. 


 Parenting-assistance programs available to appellant

 CPS set up a service plan with the goal of reuniting Mrs. Dunn and her children
that included sessions at the Center for Battered Women, a psychological evaluation, and intake
and child protective classes at Day Glo. Mrs. Dunn did not follow the plan. Although Mrs. Dunn
went to the Center, she did not receive counseling or services because she denied that she was a
victim of abuse. Mrs. Dunn also attended a psychological evaluation with Dr. Poole. She
attended the recommended therapy for awhile but soon discontinued the sessions. Finally, Mrs.
Dunn did an intake at Day Glo that indicated that she should receive individual counseling and
attend protective parenting classes for mothers of sexually abused children. Mrs. Dunn only
attended the first class. She testified that she quit going because the class participants were
required to acknowledge the sexual abuse at the beginning of each session and because the
counselor urged her to divorce Mr. Dunn. Mrs. Dunn testified that she chose instead to attend
other parenting classes with her husband through Parents Anonymous where she did not have to
deal with sexual abuse issues. 

 Stability of appellant's home

 Both Mr. and Mrs. Dunn testified that the family had moved repeatedly. Between
1987 and the children's removal in 1997, the Dunns lived in fifteen different locations. In 1993
the family was homeless for a couple of months with the parents sleeping in a tent and the children
staying with friends. The family later moved to a trailer located in Lockhart where the living
conditions were so bad that Mrs. Dunn and the children left to stay with friends. At the time of
removal, N.J.D. was in the fourth grade and had attended five different schools. A.D. was in the
second grade and had attended four different schools. Mrs. Dunn expressed no future plan for a
permanent situation for her and her children.


 Emotional and physical danger

 The record indicates that the children were placed in emotional and physical danger
within their home. Evidence indicates that the children characterized the Dunn home and both
their parents as violent. Dr. Poole testified that N.J.D. and A.D. appeared to have been terrorized
and traumatized. Although he denied having physically or sexually abused the children, Mr. Dunn
was a large man who admitted that he had a tendency to make exaggerated gestures when angry,
and he admitted often yelling and cursing at the children and calling them derogatory names. Shell
testified that Mrs. Dunn told him that she was afraid of her husband and his violent temper. 


 Appellant's acts or omissions 

 Despite Mr. Dunn's violent temper, Mrs. Dunn did not remove the children from
the dangerous situation. Mrs. Dunn's therapist stated that the appropriate reaction to a child's
sexual abuse outcry would be for the parent to believe the child, align with the child, and protect
the child from the abuser. However, the record reflects that Mrs. Dunn told people that she
thought A.D. was making up the story and she caused A.D. serious emotional distress by not
believing her. In addition, Mrs. Dunn returned the children to Mr. Dunn after A.D. made her
outcry and after CPS repeatedly directed her to keep the children away from him. When
questioned about the sexual abuse at the trial, Mrs. Dunn testified that she still did not know what
to believe and that in her opinion Mr. Dunn would be an appropriate care giver for the children. 
Finally, the record contains evidence that Mrs. Dunn remained committed to Mr. Dunn, rather
than her children, throughout the proceedings. Mrs. Dunn testified that the CPS workers' urging
her to separate from Mr. Dunn was the source of many of her arguments with them. She also
testified that one of the reasons she decided not to pursue services with Day Glo was the fact that
a Day Glo counselor urged her to divorce Mr. Dunn. She helped Mr. Dunn raise bail after he was
arrested on sexual assault charges and continued living with him throughout the relevant time,
even though she knew the children could not be returned to her in that environment. She attended
sessions and met with Mr. Dunn's therapist, but she never met with the children's therapists or
assisted in their treatment.


 Excuse for appellant's acts/omissions 

 Mrs. Dunn testified that she was physically and sexually abused growing up. 
Marcia Eyrich testified that Mrs. Dunn was made to feel that the abuse she suffered was her own
fault. Evidence also indicates that Mrs. Dunn suffers from post-traumatic stress disorder. Dr.
Poole testified that like her children, Mrs. Dunn seemed to have been terrorized and traumatized
and that PTSD can cause victims to retreat emotionally when faced with stressful situations. 
Eyrich testified that Mrs. Dunn's reaction to A.D.'s allegations was complicated by unresolved
issues stemming from her own abuse. Even with counseling and medication, Mrs. Dunn was
unwilling to take the necessary steps to protect herself or the children or to separate them from the
situation. She never maintained a regular course of treatment for her own emotional problems,
exhibiting an irregular pattern of treatment and voluntarily discontinuing helpful medication. 

 The record contains evidence from which the trial court could properly consider
the children's desires and needs, Mrs. Dunn's parenting ability, her ability to benefit or not to
benefit from assistance with her parenting, the lack of stability in appellant's home, the emotional
and physical dangers confronting the children, and appellant's past omissions in exposing the
children to a traumatic situation. We hold that the evidence is factually and legally sufficient for
the trial court to have found by clear and convincing evidence that it was in the children's best
interest to terminate appellant's parental rights. We overrule appellant's first and second points
of error. 


Surroundings that Endangered the Children

 In her fifth and sixth points of error, Mrs. Dunn contends that the evidence was
legally and factually insufficient for the trial court to find that she knowingly placed or knowingly
allowed her children to be placed in conditions or surroundings that endangered their physical or
emotional well-being. We disagree.

 The supreme court has interpreted the term "endanger" for purposes of involuntary
termination proceedings. "While we agree that 'endanger' means more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not
necessary that the conduct be directed at the child or that the child actually suffers injury." Boyd,
727 S.W.2d at 533. This Court has held that abusive or violent conduct in a child's home can
produce an environment that endangers the physical or emotional well-being of a child as
contemplated by the termination statute. See D.O., 851 S.W.2d at 354-55. 

 Mrs. Dunn contends that termination of her rights was based solely on the single
incident of February 14, 1997, when she allowed Mr. Dunn to have access to the children
following A.D.'s outcry. But a careful review of the record reveals that the surroundings to which
Mrs. Dunn exposed the children involved more dangers than sexual abuse alone. The record
indicates that both of the older children characterized the Dunn home environment as violent, and
the record reflects evidence of this violence. Dr. Poole testified that both children suffered from
PTSD and that N.J.D.'s reactions were "very consistent with [Mrs. Dunn's] depiction, that this
kid had been living in a situation that he had felt was terrorizing, out of control, threatening,
overwhelmingly intimidating." Poole testified that the sexual abuse was a "fine point," and that
his impression of the household was that it was full of "tumult and volatility and aggression and
intimidation." In questioning Eyrich, the court indicated that it took Poole's statement to mean
that the sexual abuse was symptomatic of an extremely stressful "super charged" environment that
was "oppressively" larger than the abuse itself. Randy Shell testified that Mrs. Dunn told him that
Mr. Dunn had beaten and raped her, although Mrs. Dunn later denied making the statement. The
trial court, as the finder of fact in this case, is the exclusive judge of the facts proved, the
credibility of the witnesses, and the weight to be given their testimony. See Benoit v. Wilson, 239
S.W.2d 792, 797 (Tex. 1951); K-Mart Corp. v. Pearson ex. rel. Ramos, 818 S.W.2d 410, 413
(Tex. App.--Houston [1st Dist.] 1991, no writ). We hold that the record contains clear and
convincing evidence that is factually and legally sufficient to support the trial court's finding that
Mrs. Dunn knowingly placed or knowingly allowed the children to be placed in conditions or
surroundings that endangered their emotional or physical well-being. We overrule appellant's fifth
and sixth points of error. 

 Much of the same evidence proving that Mrs. Dunn exposed the children to
emotionally or physically hazardous surroundings under section 161.001(1)(D) also supports a
finding that Mrs. Dunn engaged in conduct or at least knowingly placed the children with persons
who engaged in conduct that endangered the children's well-being under 161.001(1)(E). Section
161.001 is phrased disjunctively and only requires the Department to establish by clear and
convincing evidence that Mrs. Dunn had engaged in one of the enumerated acts of conduct. See
Tex. Fam. Code Ann. § 161.001(1); Hann, 969 S.W.2d at 81 (appellate court must affirm
judgment of trial court if there is sufficient evidence to support any one of numerous theories
alleged under 161.001(1)). Nevertheless, we hold that the record contains clear and convincing
evidence that is legally and factually sufficient to support the finding that Mrs. Dunn engaged in
conduct or knowingly placed the children with persons who engaged in conduct that endangered
their physical or emotional well-being. Either of these grounds alone supports the court's
termination ruling. We overrule appellant's third and fourth points of error. 

Reasonable Efforts to Reunite

 In her seventh point of error, Mrs. Dunn contends that there is insufficient evidence
to support the court's finding that the Department made all reasonable efforts, consistent with time
and circumstances, to reunite the children with the family. Although the record does contain
evidence of these efforts, Section 161.001 does not require that the court make this finding before
ordering termination. See Tex. Fam. Code Ann. § 161.001; Jones v. Dallas County Child
Welfare Unit, 761 S.W.2d 103, 109 (Tex. App.--Dallas 1988, writ denied) (citing Moreland v.
State, 531 S.W.2d 229, 235 (Tex. Civ. App.--Houston [1st Dist.] 1975, no writ)). Thus, Mrs.
Dunn cannot show that even a failure of proof probably caused rendition of an improper judgment
or probably prevented her from properly presenting her case on appeal. See Tex. R. App. P.
44.1. We overrule appellant's seventh point of error.(4)


Exclusion of Karen Hutchins's testimony

 In her eighth point of error, Mrs. Dunn contends that the trial court erred in
excluding the testimony of Mr. Dunn's therapist Karen Hutchins.(5) 

 In general, the admission or exclusion of evidence is committed to the trial court's
sound discretion. See City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). 
However, former Rule 215.5 of the Texas Rules of Civil Procedure mandated the exclusion of
expert testimony when a party failed to respond to or supplement responses to discovery.(6) See
former Tex. R. Civ. P. 215.5 (West 1998). An exception existed when a party showed good cause
for admitting the evidence despite the failure to respond. See id. The trial court had discretion
in deciding whether a party established good cause. See Birnbaum v. Alliance of Am. Insurers,
994 S.W.2d 766, 781 (Tex. App.--Austin 1999, pet. denied); Dewitt v. Prudential Ins. Co. of
Am., 717 S.W.2d 414, 417 (Tex. App.--Houston [14th Dist.] 1986, no writ). A trial court abuses
its discretion when it acts in an unreasonable and arbitrary manner or without reference to any
guiding rules or principles. See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985). This Court may not reverse for abuse of discretion merely because we disagree with
the decision of the trial court. See id. at 242. A party seeking to reverse a judgment based on the
admission or exclusion of evidence must show that the evidence was erroneously admitted or
excluded and that the error probably caused rendition of an improper judgment. See City of
Brownsville, 897 S.W.2d at 753; see also Tex. R. App. P. 44.1(a)(1). 

 Neither Mr. nor Mrs. Dunn designated Hutchins as an expert witness in response
to the Department's discovery request. Mrs. Dunn argues that the Department designated, but did
not call, Hutchins and therefore the Department would not have been unfairly surprised had she
been allowed to testify. Mrs. Dunn believed that Mr. Dunn had designated Hutchins and contends
that she should not be held accountable for his mistake. Mrs. Dunn contends that Hutchins's
opinion regarding the best interest of the children would have affected the trial's outcome. We
note the testimony was presented by bill of exceptions and the trial was to the court, not a jury
trial. In the bill of exceptions, when asked whether she believed termination would be in the
children's best interest, Hutchins opined only that termination was premature. 

 None of Mrs. Dunn's arguments has merit. She contends that the Department was
not surprised by the expert. Under former Rule 215.5, lack of surprise, standing alone, did not
constitute good cause.(7) See Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914 (Tex. 1992). We
also reject Mrs. Dunn's argument that she is being held responsible for Mr. Dunn's failure to
designate. Mrs. Dunn gives no explanation for her failure to designate Hutchins other than her
assumption that Mr. Dunn would do so. This claim reduces to a claim that at best her failure was
inadvertent. Like lack of surprise, inadvertence, standing alone, did not constitute good cause
under 215.5. See id. Nor are we persuaded that Hutchins's opinion as to the children's best
interest would have affected the trial's outcome. As we have previously noted, the best interest
of the children is determined by looking at a number of factors. Mrs. Dunn has failed to show that
exclusion of a single therapist's opinion that termination is "premature" probably led to the
rendition of an improper judgment. See City of Brownsville, 897 S.W.2d at 753. Because Mrs.
Dunn has failed to show either good cause for her failure to designate Hutchins or sufficient harm
to constitute reversible error, we overrule Mrs. Dunn's eighth point of error.


CONCLUSION

 We have determined that there is legally and factually sufficient evidence to support
the findings that justify terminating appellant's parental rights under section 161.001 of the Family
Code, that Mrs. Dunn has failed to demonstrate harm from the trial court's finding that the
Department made all reasonable efforts to reunite the family, and that Mrs. Dunn has failed to
show that the trial court erred in excluding Karen Hutchins's testimony. Having overruled Mrs.
Dunn's points of error, we affirm the trial court's decree terminating her parental rights.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel 

Affirmed

Filed: September 14, 2000

Do Not Publish


1. The record is unclear regarding the source of the referral and to whom A.D. made the
outcry.
2. Although Mrs. Dunn's brief lists Mr. Dunn as an appellant, Mr. Dunn has not perfected
his appeal to this Court and is therefore not a party to this appeal.
3. Mrs. Dunn contends that there is no evidence that termination is in the best interest of
N.A.D. While it is true that the record contains little direct evidence regarding her interest, we
believe her best interest can be inferred from the direct evidence establishing her siblings' best
interest in the same way a parent's abusive conduct directed toward one child can support
termination as to other children. See Lucas v. Texas Dep't of Protective and Regulatory Servs.,
949 S.W.2d 500, 503 (Tex. App.--Waco 1997, pet. denied); Director of the Dallas County Child
Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling, 833 S.W.2d 730, 732-33 (Tex.
App.--Dallas 1992, no writ).

4. To the extent that "all reasonable efforts" includes the programs and services that CPS
offered Mrs. Dunn, this issue is discussed in relation to the court's determination of the children's
best interest.
5. This point of error states that Hutchins was a rebuttal witness. However, Mrs. Dunn
makes no argument that Hutchins was a rebuttal witness, and the authorities she cites concern
admission of evidence in general.
6. Rule 215.5 was amended and renumbered as Rule 193.6 effective January 1, 1999. 
Because this trial was governed by the old rules, we will decide this case under the pre-amendment
version. 
7. Under current Rule 193.6 a party may overcome the failure to respond by showing a lack
of surprise and unfair prejudice. See Tex. R. Civ. P. 193.6(a)(2). 


 would not have been unfairly surprised had she
been allowed to testify. Mrs. Dunn believed that Mr. Dunn had designated Hutchins and contends
that she should not be held accountable for his mistake. Mrs. Dunn contends that Hutchins's
opinion regarding the best interest of the children would have affected the trial's outcome. We
note the testimony was presented by bill of exceptions and the trial was to the court, not a jury
trial. In the bill of exceptions, when asked whether she believed termination would be in the
children's best interest, Hutchins opined only that termination was premature. 

 None of Mrs. Dunn's arguments has merit. She contends that the Department was
not surprised by the expert. Under former Rule 215.5, lack of surprise, standing alone, did not
constitute good cause.(7) See Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914 (Tex. 1992). We
also reject Mrs. Dunn's argument that she is being held responsible for Mr. Dunn's failure to
designate. Mrs. Dunn gives no explanation for her failure to designate Hutchins other than her
assumption that Mr. Dunn would do so. This claim reduces to a claim that at best her failure was
inadvertent. Like lack of surprise, inadvertence, standing alone, did not constitute good cause
under 215.5. See id. Nor are we persuaded that Hutchins's opinion as to the children's best
interest would have affected the trial's outcome. As we have previously noted, the best interest
of the children is determined by looking at a number of factors. Mrs. Dunn has failed to show that
exclusion of a single therapist's opinion that termination is "premature" probably led to the
rendition of an improper judgment. See City of Brownsville, 897 S.W.2d at 753. Because Mrs.
Dunn has failed to show either good cause for her failure to designate Hutchins or sufficient harm
to constitu