In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00184-CR
______________________________


JULIO MARTINEZ, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 102nd Judicial District Court
Bowie County, Texas
Trial Court No. 02-F-578-102


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â Julio Martinez was convicted on his plea of guilty for driving while intoxicated, a third
degree felony. The court set punishment, pursuant to a negotiated plea agreement, at ten years'
imprisonment and no fine. Martinez appeals.
Â Â Â Â Â Â Â Â Â Â Â Â The record does not include any certification by the trial court of Martinez's right of appeal
as required by Tex. R. App. P. 25.2(a)(2). We noted this defect, and contacted trial counsel and
Martinez by letter sent on September 4, 2003, warning of this defect, and also warning that, if we
did not receive a certification within thirty days, pursuant to Tex. R. App. P. 25.2(d),Â 37.1, we would
be required to dismiss the appeal. 
Â Â Â Â Â Â Â Â Â Â Â Â There has been no response.
Â Â Â Â Â Â Â Â Â Â Â Â We dismiss the appeal. 
Â 


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â November 3, 2003
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â November 4, 2003

Do Not Publish



"
 UnhideWhenUsed="false" Name="Colorful Shading"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No. 06-11-00019-CV

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  IN
THE INTEREST OF J.L.B. AND J.R.B., CHILDREN

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the 307th
Judicial District Court

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Gregg County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial Court No. 2010-544-DR

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Opinion by Justice Moseley








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  O P I N I O N

Â 

Â Â Â Â Â Â Â Â Â Â Â  This
is a joint appeal by the mother and father of two children, Samuel and Joshua,[1] of a
judgment of the termination of their parental rights to those children. Â The trial court gave the same three reasons as
the bases for terminating each parentÂs rights.Â 
The trial court found that both parents

knowingly
placed or knowingly allowed the [children] to remain in conditions or surroundings
which endanger the physical or emotional well-being of the [children];[2]


Â 

engaged
in conduct or knowingly placed the [children] with persons who engaged in
conduct which endangers the physical or emotional well-being of the [children];[3]

Â 

had [their]
parent-child relationship terminated with respect to another child based on a finding
that [the parentsÂ] conduct was in violation of Â§ 161.001(1)(D)or (E), Texas
Family Code, or substantially equivalent provisions of the law of another
state.[4]

Â 

Â Â Â Â Â Â Â Â Â Â Â  The
trial court also found that it was in the best interest of the children that
the parental relationship be terminated.

Â Â Â Â Â Â Â Â Â Â Â  We
affirm the trial courtÂs judgment of termination. 

Sufficiency of the Evidence

Â 

Â Â Â Â Â Â Â Â Â Â Â  The
parentsÂ first point of error asserts that the evidence is legally insufficient
to support the findings by the trial court as recited above. Â The second point of error contends that the
evidence is factually insufficient to support those findings.[5] 

Â Â Â Â Â Â Â Â Â Â Â  We
begin by summarizing the testimony and evidence admitted at trial, generally
grouping the evidence into subjects which were ultimately relevant to the trial
courtÂs rulings.Â  We focus on the
following areas: Â the childrenÂs past and
present circumstances and upbringing, the condition of the family home, the
intellectual, emotional, developmental, physical, and educational status of the
children, and the motherÂs and fatherÂs past and present status as it affects
their ability to parent the children.

Background and Living ConditionsÂ  

Â 

Â Â Â Â Â Â Â Â Â Â Â  Samuel
(born in January 2005) and Joshua (born in January 2007) first came to the
attention of the Child Protective Services Division of the Texas Department of
Family and Protective Services (CPS) when a law enforcement officer stopped a
speeding vehicle driven by Russell McCurry, a friend of the boysÂ parents.Â  Samuel and Joseph were in the back seat of
the car and at that time, Joshua was naked and wrapped in a blanket while
Samuel was dressed in a jumpsuit.Â  The
deputy sheriff who stopped the vehicle said SamuelÂs jumpsuit was ÂfilthyÂ and
the boy had defecated in his pants.Â  Both
boys smelled as if neither had been bathed in days.Â  McCurry testified that Joshua was wrapped in
the blanket because he had also defecated in his pants, causing McCurry to
throw the childÂs clothes away.Â  At the
time of the stop, Samuel was five years old and Joshua was three, but neither
was potty trained.[6]
Officers took the boys to the police station, where they were cleaned up.Â  CPS representatives went to the parentsÂ home
to investigate and the investigation revealed numerous unsafe and filthy
conditions, discussed below.

Â Â Â Â Â Â Â Â Â Â Â  McCurry
testified he had taken the boys, with the acquiescence of the parents, to
panhandle (i.e., to beg for money) from people in stores and parking lots.Â  Although McCurry equivocated somewhat in his
testimony,[7] it
was clear that he had used the boys in this kind of money-raising endeavor on
previous occasions.Â  McCurry had used the
boys in this fashion before to acquire money, both alone and in concert with
the parents.Â  Although Detective David Falco initially testified that the father had told Falco he and McCurry used the boys in panhandling, on
cross-examination, Falco said that the father was
Âevasive about the panhandling issue during his interviewÂ and that concrete
information that the boys were used for panhandling came solely from
McCurry.Â  The day before the traffic
stop, after the boys had been taken to school, the parents and McCurry tended
to panhandling, using the proceeds to buy drugs and then Âg[e]t high.ÂÂ  Later that night, while the parents continued
to smoke crack cocaine in their bedroom, they allowed McCurry to take the boys
on another panhandling trip,[8]
McCurry relating that the father had told him to take the boys and Âgo make
some money.ÂÂ  McCurry and the boys were
gone for a day or more.Â  At some point,
McCurry went to a drug house to purchase crack cocaine, but he said that he was
careful not to take the boys into the house with him.Â  Rather, he got a woman (whom he did not know)
to come out from the house and sit with the boys while he purchased and smoked
his crack cocaine.Â  

Â Â Â Â Â Â Â Â Â Â Â  Based
on testimony from Detective Falco and the deputy who
conducted the traffic stop of McCurry, it appears the parents may have reported
the children as having been kidnapped.Â 
However, since the parents had waited until after the boys had been gone
for at least a day before reporting their absence and due to inconsistencies in
the story the parents related, the authorities treated their news as a missing
persons report and not as a kidnapping.[9]

Â Â Â Â Â Â Â Â Â Â Â  The
State presented several witnesses who had visited the family home and testified
as to its condition.Â  The StateÂs contact
with the home began on or around the day the children were found in McCurryÂs
charge.Â  In general, the testimony and
pictures admitted into evidence described a dwelling which could be described
most charitably as a cluttered mess and, more realistically, as an unsanitary,
unsafe fire hazard. Â (As if confirming
the observations about the unsafe condition of the house, it burned to the
ground within a few months after the boysÂ removal by CPS.)

Â Â Â Â Â Â Â Â Â Â Â  Several
witnesses testified to an unpleasant odor coming from the familyÂs home.
Specifically, Verdell Burton[10]
described the smell as a Âfoul odorÂ from urine and testified that on one of
her visits to the home, she observed dog urine on the floor.Â  When she discussed the presence of the
undisturbed dog urine, the parents acted as if such a condition was normal and
made no attempt to clean it from the floor.Â 


Â Â Â Â Â Â Â Â Â Â Â  CPS
investigator Clough likewise described a Âvery foul odorÂ emanating from the
house.[11] Â Clough had first gone to the family home after
the boys had been discovered in McCurryÂs automobile, the purpose of her visit
being to investigate the conditions at the home and to make contact with the
boysÂ parents. Â Clough was present at the
house when the police brought the boys home after having been removed from
McCurryÂs automobile.Â  At that time, the
boys were still wrapped in blankets because the police had washed the boysÂ
clothes and they were not yet dry.Â 
Although the parents were not at the house when Clough arrived, she was
met by the boysÂ paternal grandmother, who also lived in the house.Â  After Clough asked the grandmother, who had
significant vision problems, to locate clothing for the boys, the grandmother
took a pair of shorts and a T-shirt (neither of which was clean) from one of
many piles of clothes in the house, handing the shorts to Samuel and the T-shirt
to Joshua.Â  Samuel donned the shorts,
sans any underwear, and Joshua put on the T-shirt, backwards.Â  Clough considered the clothing inappropriate
because although it was warm in the house, the outside temperature was quite
cool.Â  She was also concerned about
sharp, torn edges of the linoleum floor which pointed up, and spider webs on
windows.Â  

Â Â Â Â Â Â Â Â Â Â Â  When
Clough asked the grandmother about the smell which permeated the house, the
grandmother responded that Âthe house needed to be tidied up a bit.ÂÂ  Clough found this to be something of a
monumental understatement, observing piles of trash and clothes throughout the
house,[12]
Âold food, soiled potsÂ on the kitchen table, and Âpots on the floors of the
kitchen with old food in them.ÂÂ  Clough
said although the chairs around the kitchen table were all broken, their
condition did not prevent Joshua from climbing up the chairs onto the cabinets
Âas if he were playing a game.ÂÂ  Despite
the fact that the kitchen sink was full of dirty dishes, it did not appear to
be functional because Âit was broken and actually leaning to the side.Â Â Clough discovered that the refrigerator
contained rodent droppings, but no edible food.[13]Â  Her description of the area continued: 

There
were tons of pots, old food, there was trash underneath the refrigerator.Â  And when I refer to trash, it is actually a
combination of clothing, paper goods, metal goods, forks and spoons, just
appeared to be a kind of a catch all.Â  

Â 

Clough was also concerned to find
one of the burners on the stove was lit and burning.Â  Clough feared the children, with their access
to the kitchen, could burn themselves.Â 
The stoveÂs knobs were all removed, and the grandmother explained a
Âspecial toolÂ was needed to turn off the stove, which was kept burning to
assist in heating the house.Â  Clothing
and paper were packed beneath the stove, where a broiler or storage drawer was
usually located; Clough considered this to be a fire hazard.Â  Clough was concerned by the high number of
electrical appliances and their cords, and she observed the boys playing with
electrical outlets.Â  Throughout the house
Clough saw space heaters situated dangerously close to piles of clothes, which
Clough said were fire hazards.Â  

Â Â Â Â Â Â Â Â Â Â Â  B.
J. Owens, city code enforcement officer for the City of Kilgore, testified that
he had made several investigations of the house since 2005, issuing thirteen or
fourteen citations for hazardous conditions (e.g., various junk and debris on
the exterior and problems with rodent and mosquito harborage on the premises). Â He observed that in May 2010, the house had no
running water.[14]Â  At some point, the house was formally
condemned.Â  Owens said he was not surprised
that the house had burned, as he had seen several fire hazards in his
inspections and said,Â  

Well,
during an inspection, I walk in, thereÂs piles of trash with propane heaters
sitting beside them, candles sitting beside them.Â  Some of the photographs[15]
show extension cords running over -- running over paper and trash, and itÂs
just -- itÂs like I had told [the mother], you know, itÂs dangerous to have
that kind of open flame -- Coleman lanterns laying on top of a dresser that has
piles of clothes and trash thatÂs piled up on there, dogs running around the
house with extension cords pulled out everywhere.Â  So there were plenty of things that would
kind of give you pause or give me pause and say, ÂLook, you need to clean this
up.Â  You need to clean this up.ÂÂ  

Â 

Although Owens stated the
appellants had made some repairs and done some cleaning, he did not believe the
home was safe for a family.Â  Clough also
said she did not feel the children were safe in the home, which led to her
decision to remove them to CPS custody.Â  

Â Â Â Â Â Â Â Â Â Â Â  At
the time of the trial, the parents had relocated to a different house, a
different one from the one they had inhabited at the time of the boysÂ
removal.Â  CPS investigator Natalie Wash
visited this second home and, after observing it, still harbored a number of
concerns.Â  In the more recent abode, the
dogs seemed ÂdirtyÂ and there was a fish tank which did not seem clean.Â  There was a plate of dog food on a table next
to the couch which would have been in reach of children; Wash observed cords
hanging off a cabinet which held figurines.Â 
Wash was concerned that in her visits to this more recent home over the
course of a few months, the amount of clutter consistently increased with the
duration of the parentsÂ occupancy.Â  The
house did not exhibit what Wash would consider Âminimum standards of being
clean.ÂÂ  An animal control officer
testified that he found several pieces of Âhours oldÂ dog feces in the
grandmotherÂs bedroom and a shed where puppies were being kept had a Âpretty
bad situation of feces.ÂÂ  The officer
testified the conditions were unsanitary.Â 


Condition of the Children

Â Â Â Â Â Â Â Â Â Â Â  Mary
Beth Gaddy, a special education teacher, taught
Joshua for about two months before CPS became involved and the children were
removed from the appellantsÂ home.Â  Gaddy said that Joshua was Âbasically nonverbal . . . . No
use of language, he produced syllables.Â[16] Â As for Samuel, she said she could understand
him because she was accustomed to listening to ÂunintelligiblesÂ
and could generally discern what children were saying.Â  She did opine that both boys were in need of
speech therapy.Â  When CPS removed the
boys from the home, both children suffered from significant speech difficulties.Â  CPS caseworker Wash testified that since the
removal from the home, the boys were each receiving speech therapy two hours
per week.Â  She described both boys as
being Â[i]ncoherent,Â
relating that, for example, the boys were unable to have a Âconversation where
somebody could easily understand what they were saying to get their point
across.ÂÂ  The speech therapy included
some which was received in school and additional therapy outside of school;
Wash said that the boys would require long-term speech therapy and that Joshua
had been diagnosed as Âprobable Aspergers and mental
retardation.ÂÂ  Wash testified that the
boys were responding quite well to the structure and consistent attention they
were receiving in foster care.Â  

Â Â Â Â Â Â Â Â Â Â Â  Gaddy evaluated Joshua about a month before his third
birthday, finding his development to be well below normal. Â Although the child was almost 36 months of
age, JoshuaÂs cognitive skills were in the normal range of a child aged 6 to 16
months old, language skills in the 6- to 17-month range, gross motor skills in
the 11- to 27-month range, fine motor skills within the 16- to 32-month range,
the self-care skills within the 10- to 15-month range, and social skills within
the 5- to 14-month range.Â  Gaddy was also very concerned with JoshuaÂs appearance
because he smelled bad and was consistently unclean, sometimes with dried food
on his clothes.Â  She worried about this
not only for hygienic reasons, but because she feared that other children would
tease or ostracize him, further impeding his personal development.Â  Gaddy visited the
family home, once even providing soap, towels, and detergent and talking with
the mother about her responsibility to clean the boys.Â  Although Gaddy only
taught Joshua about two months and her delivery of the cleaning items occurred
about a month into her contact with the boy and his family, she described the
difference in cleanliness after her delivery as Â[m]inimal.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  Psychologist
Donald Winstead evaluated Samuel.Â  Winstead found the
boyÂs intelligence quotient (IQ) to be in the Âmentally deficient range.ÂÂ  Samuel exhibited developmental delays in
academic achievement scores, in emotional problems, and in his difficulties
relating to and dealing with other people.Â 
Winstead recommended involvement in
extracurricular activities, occupational therapy, and active family
involvement.Â  WinsteadÂs
written evaluation made the following observations:

There
was a significant difference between his verbal and nonverbal abilities in a
pattern often seen with children who have been raised in an abusive, neglectful
and/or chaotic caregiving environment.Â  His overall ability to function in school was
rated as very poor.Â  He has notable
attention and concentration deficits.Â  

Â 

. .
. .

Â 

. .
. . The overall quality of his family relationships was rated as below
average.Â  His self-esteem was rated as
very poor.Â  His ability to express
affection toward and accept affection from others was rated as below average.

Â 

. . .
. 

Â 

[Samuel]
does not have a history of behavioral problems.Â 
However, his overall ability to control his behavior in social
situations was rated as poor.Â  He is
described as hyperactive and impulsive.Â 
He exhibits negative-contrary behavior.Â 


Â 

Both children were experiencing
developmental delays in their intellectual progress. Â Joshua, the younger boy, was diagnosed with Âa
pervasive development disorder.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  The
foster mother with whom the boys were placed testified the boys were evidently
not experienced in either bathing or brushing their teeth. Â In her first attempt at bathing the children,
it took two hours for her to coax the boys to the bathtub and calm them enough
to be cleaned.Â  The dental care of the
boys was apparently nonexistent. Â Samuel
had nine cavities in his teeth, while Joshua had eight; both boysÂ teeth were
covered with plaque.Â  CPS caseworker Wash
related that at least one of the children required some degree of dental
surgery, including having caps installed. Â Samuel required having some teeth removed and
a spacer installed.Â  Wash testified that
on her initial evaluation, she observed that the boys were very thin and when
food was placed before them or they Âsaw food anywhere in the room wherever
they were, they would immediately run to the food and shove it in their
mouth[s] as quickly as they could.ÂÂ Â  

Â Â Â Â Â Â Â Â Â Â Â  Even
after about five weeks after the boys were removed from their parentsÂ care,
both boys tested positive for cocaine in their systems. Â Cindy Beck, a chemical dependency counselor,
said it was possible that if cocaine residue was on a surface in the home, a
small child of the age of three to five could touch that residue, put his
fingers in his mouth, and thereby ingest the cocaine into his system.Â  

The Parents

Â 

Â Â Â Â Â Â Â Â Â Â Â  Psychologist
Winstead evaluated the parents and described both of
them as having cognitive functioning in the Âborderline range of
intelligence.ÂÂ  At this mental level,
such persons Âare capable of normal functioning, they have a job, drive a car,
raise kids, those types of things.ÂÂ  Winstead diagnosed the mother as suffering from
post-traumatic stress disorder (PTSD) stemming from her abusive and neglected
childhood.Â  She acknowledged to Winstead she had been neglected and physically and sexually
abused[17] as
a child, and Winstead opined that people with such a
history are at increased risk of visiting this same kind of mistreatment upon
their own children.Â  He found her to
suffer from attachment disorder, a condition which prevented her from
regulating her own emotions and being able to properly attach or relate to
children.Â  Winstead
held the opinion that the PTSD from which she suffered could prevent the mother
from dealing with her own anger or depressive feelings, a circumstance which
could then cause traumatic instances with children.Â  Winstead made the
following recommendation of treatment for the mother:Â  

Without
long-term, intensive psychotherapy, there was a significant probability that
[the mother] would not be able to effectively care for her children on a
consistent basis.

Â 

Winstead
recommended two to five years of at least weekly counseling for the
mother.Â  In his written evaluation, Winstead stated the mother possesses characteristics of
persons known to abuse children.

Â Â Â Â Â Â Â Â Â Â Â  Winstead also evaluated the father and found evidence that
the father had been abused as a child.Â  Winstead again posited that such a history could lead to
the father to have the potential to be abusive to children, although he also
acknowledged that there was no evidence of any abuse on the fatherÂs part.Â  The father exhibited traits of low level
depression and schizoaffective symptoms, such as delusional thinking, something
consistent with reports that the father had claimed to see and hear spirits.Â  WinsteadÂs written
evaluation noted that the father has auditory hallucinations and believed that
he has seen ghosts in his house.[18]Â  A pertinent observation in the written report
is the following:

[The
father] is likely to be threatened by a childÂs normal strivings for a sense of
power and independence and likely views a child who expresses a view/opinion
that is different from that of his parentÂs view as a form of disrespect.Â  He may expect children to be strictly
obedient and may be easily threatened when his parenting is questioned.Â  [The father] is not likely to value
negotiation and compromise as a means of solving problems between a parent and
a child.Â  

Â 

[The
father] has significant problems with his
children.Â  He is likely to describe
his children in a negative manner. . . . Overall, he is likely to perceive that
his children have limited ability and / or competency.Â  

Â 

Also noteworthy in the conclusion
of the written evaluation is that Winstead observed
that the father displayed symptoms of ÂAvoidant, Borderline, Dependent,
Paranoid, Schizoid, and Schizotypal Personality
traits with depressive, sadistic, passive aggressive and self-defeating
features.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  Mason
also saw and evaluated the parents.Â 
Mason testified she did not think the boys were safe in the parentsÂ
home and did not believe the parents could protect the boys from further abuse
or harm.Â  When asked if there was
anything that could make the placement with the parents safe for either the
boys or for any other children, Mason said she had no Ârecommendations that
would fulfill [that] request.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  Winstead said both parents would need to Âwork throughÂ
their respective psychological and emotional issues Âbefore they would be ready
to provide some consistent parenting.ÂÂ 
Mason said she believed that both parents would require five to eight
years of weekly counseling to be able to care for their children.Â  

Â Â Â Â Â Â Â Â Â Â Â  Both
appellants admitted to CPS investigator Clough they were active users of
cocaine and that on the Friday before the boys were found with McCurry, they
had purchased and used drugs with McCurry.Â 
The parents similarly admitted to Detective Falco
having used crack cocaine the day before they reported the boys as
missing.Â  Clough said that on or about
March 15, 2010, both parents tested positive for cocaine use, this date being
about a week after the boys were found with McCurry.[19]Â  McCurry, as mentioned above, testified to
frequent use of illegal drugs by the parents.

Â Â Â Â Â Â Â Â Â Â Â  In
her defense, the mother presented a chemical dependency counselor as a witness
in her behalf who said that the mother seemed to have made progress in avoiding
illicit drugs and that continued avoidance of those drugs would improve her
parenting ability.Â  There was also
testimony that the parents had made some repairs to the home and had attended
some parenting classes.Â  Wash said they
actually completed a service plan established by CPS, and psychologist Winstead said they attended parenting classes conducted by
him.Â  However, counselor Mason testified
that although the father attended more than half of the assigned parenting
classes which she conducted, he was ÂeliminatedÂ from the class for failing to
attend the required number.Â  

Standard of Review

Â 

Â Â Â Â Â Â Â Â Â Â Â  We
now turn to the question of whether the requisite clear and convincing evidence
established sufficient proof of the alleged grounds for termination of the
appellantsÂ parental rights. Â Tex. Fam. Code Ann. Â§ 161.001 (West 2010); In re J.O.A., 283 S.W.3d 336, 344 (Tex. 2009).Â  Clear and convincing evidence is Âproof that
will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.Â Â J.O.A., 283 S.W.3d at 344.

Â Â Â Â Â Â Â Â Â Â Â  When
legal sufficiency of evidence supporting termination of parental rights is
challenged, we look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that the finding was true. Â Id. at
344Â45 (citing In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002)).Â  In this bench trial, we assume
that the trial court resolved disputed facts in favor of its finding if a
reasonable fact-finder could do so, but disregard all evidence that a
reasonable fact-finder could have disbelieved or found toÂ  have been incredible. Â J.F.C,
96 S.W.3d at 266.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
reviewing for factual sufficiency, we give due consideration to evidence the
court could reasonably have found to be clear and convincing.Â  In re
C.H., 89 S.W.3d 17, 27 (Tex. 2002).Â 
We are to determine whether the evidence is such that a fact-finder
could reasonably form a firm belief or conviction about the truth of the
allegations.Â  Id. at 25.Â  A court of
appeals should consider whether disputed evidence is such that a reasonable
fact-finder could not have resolved that disputed evidence in favor of its
finding.Â  J.F.C., 96 S.W.3d at 266.Â 
If, in light of the entire record, the disputed evidence that a
reasonable fact-finder could not have credited in favor of the finding is so
significant that a fact-finder could not reasonably have formed a firm belief
or conviction, then the evidence is factually insufficient.Â  Id.Â  

Sufficient Evidence Supports Two Findings as Grounds for Termination

Â Â Â Â Â Â Â Â Â Â Â  There
was ample evidence to support the finding that the parents knowingly placed or
knowingly allowed the children to remain in surroundings that endangered the
childrenÂs physical or emotional well-being. Â Tex.
Fam. Code Ann. Â§ 161.001(D).Â  As
stated above, several witnesses testified that the house was not safe for the
boys and a psychologist who examined both parents said neither was capable of
safely caring for the boys.Â  There was
testimony regarding the unsanitary and unsafe living conditions (e.g., trash
throughout the house and yard, piles of trash and clothes were dangerously
close to open flames or space heaters throughout the house, a distinct foul
odor throughout the house caused by unclean conditions, an odor often
attributed to urineÂÂdeposited both by dogs[20]
and, perhaps by the boysÂÂwhich none of the occupants seemed compelled to clean
up).Â  Viewed in the light most favorable
to the trial courtÂs ruling, we find a reasonable trier
of fact could have formed a firm belief or conviction the parents knowingly
placed or knowingly allowed the boys to remain in conditions or surroundings
that endangered the boysÂ physical or emotional well-being.Â  The evidence is legally sufficient to support
a finding of termination under Section 161.001(D).Â  Tex.
Fam. Code Ann. Â§ 161.001(D); see
also In re C.L.C., 119 S.W.3d
382, 388Â89, 393Â94 (Tex. App.ÂTyler 2003, no pet.) (admitted drug problem and
drug use, and unsafe, unsanitary conditions in house and yard among other
conditions deemed to endanger childrenÂs well-being); Jones v. Dallas County Child Welfare Unit, 761 S.W.2d 103, 105Â06
(Tex. App.ÂDallas 1988, pet. denied) (school-age child Âsoiling himself two to
three times a dayÂ; Âmalodorous living conditionsÂ; piles of garbage and dirty
clothes; house smelled of mold and urine; sufficiently supported termination
based on children being allowed to remain in conditions or surroundings, or
parents engaging in conduct which endangers childrenÂs physical or emotional
well-being).Â  

Â Â Â Â Â Â Â Â Â Â Â  Likewise,
the evidence was factually sufficient.Â 
In reviewing factual sufficiency, we consider all of the evidence
reviewed under a legal sufficiency review, and give due consideration to
evidence the fact-finder could reasonably have found to be clear and
convincing.Â  In re J.F.C, 96 S.W.3d at 266 (citing In re C.H., 89 S.W.3d at 25).Â 
Beck, a chemical dependency counselor, testified that she had worked
with the mother, who had curtailed her drug use.Â  There was testimony the parents had effected
some repairs to the first home before it burned.Â  There was evidence the parents participated
in, and completed, some service plans and parenting classes designed or
assigned by the StateÂs agency.Â  Conceivably,
this is evidence that disputes the StateÂs evidence that discounts the parentsÂ
ability to carry out the duties of parents.Â 
Nonetheless, giving due deference to the trial courtÂs factual
determination, we find the state of the evidence sufficient that the
fact-finder could reasonably form a firm belief or conviction the parents
knowingly placed or knowingly allowed the boys to remain in conditions or
surroundings that endangered the boysÂ physical or emotional well-being.

Â Â Â Â Â Â Â Â Â Â Â  There
was also clear and convincing evidence that the parents engaged in conduct or
knowingly placed the children with persons who engaged in conduct that
endangered the childrenÂs physical or emotional well-being. Â Tex.
Fam. Code Ann. Â§ 161.001(E). 

Â Â Â Â Â Â Â Â Â Â Â  A
great deal of the evidence cited above also supports termination on this
ground.Â  The parentsÂ frequent use of
illegal drugs (including exposure to the extent that the boys actually tested
positive for cocaine), their neglect of the children as evidenced by the boysÂ
lack of cleanliness or personal hygiene and unfortunate dental conditions, the
use of the boys to panhandle, and allowing another frequent drug user, McCurry,
to take the children on panhandling trips (where one such trip included a stop
at a drug house, where the boys were left in the care of an unidentified woman
while McCurry purchased and ingested drugs), all constitute knowing conduct
that endangered the physical and emotional well-being of the children and
knowingly placing the children with persons who engaged in conduct which
endangered the boysÂ physical or emotional well-being.Â  Tex.
Fam. Code Ann. Â§ 161.001(E); see
also J.O.A., 283 S.W.3d at 345
(ÂparentÂs use of narcotics and its effect on his or her ability to parent may
qualify as an endangering course of conductÂ).Â 
The evidence is legally sufficient to support the trial courtÂs finding
on this termination ground.

Â Â Â Â Â Â Â Â Â Â Â  The
evidence is also factually sufficient to support termination on this
allegation.Â  Even with the chemical
dependency counselorÂs testimony that the mother had curtailed or ceased her
use of illegal drugs, substantial damage had already been done:Â  there was evidence of regular drug use by
both parents prior to CPSÂs involvement in this case.Â  The trial court could reasonably deduce that
such drug use had been present throughout the childrenÂs lives and that without
the agencyÂs intervention, the drug abuse would have continued.Â  The same could be said of the use or
involvement of the boys in panhandling, even if the fact-finder were to
consider they had only been present and not actually used to solicit
donations.Â  As for the parentsÂ
statements to law enforcement that they did not give McCurry permission to take
the boys on the night or in the hours before they were found, the trial court,
as fact-finder, judged the credibility of witnesses and resolved any conflicts
in testimony.Â  See In re R.W., 129
S.W.3d 732, 742 (Tex. App.ÂFortÂ Worth 2004, pet. denied).Â  Â[C]onduct that
subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child. Â Drug use and its effect on a parentÂs life and
his ability to parent may establish an endangering course of conduct.Â Â In re
N.S.G., 235 S.W.3d 358, 367Â68 (Tex.
App.ÂTexarkana 2007, no pet.).

Best Interests of Children

Â Â Â Â Â Â Â Â Â Â Â  There
is a strong presumption that a childÂs interest is best served by preserving
the conservatorship of the parents; however, clear and convincing evidence to
the contrary may overcome the presumption. Â In re
R.R., 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).
Â In deciding whether termination would be
in the best interest of the child, the trial court may consider this
nonexclusive list of factors: Â (1) the
desires of the child; (2) the emotional and physical needs of the child now and
in the future; (3) the emotional and physical danger to the child now and in
the future; (4) the parental abilities of the individuals seeking custody; (5)
the programs available to assist these individuals to promote the best interest
of the child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the acts or
omissions of the parent. Â Holley v. Adams, 544 S.W.2d 367, 371Â72
(Tex. 1976); In re K.W., 335 S.W.3d
767, 770 (Tex. App.ÂTexarkana 2011, no pet.). Â Also, evidence offered to prove grounds for
termination is relevant to determining if the termination is in the best
interest of the child. Â C.H., 89 S.W.3d at 28; In re J.W.M., 153 S.W.3d 541, 548Â49
(Tex. App.ÂAmarillo 2004, pet. denied) (ÂWhile the prospect of adoption into a
stable home cannot alone be said to be a determinative factor, it clearly is
among the factors the court properly could consider . . . .Â). Â It is unnecessary to prove all of these
factors as a condition precedent to parental termination. Â C.H.,
89 S.W.3d at 27.

Â Â Â Â Â Â Â Â Â Â Â  There
are several evidentiary items discussed above which point to termination being
in the boysÂ best interests.Â  The
emotional and physical needs of the children now and in the future would be
better served by being with parents more like the foster mother, with whom the
boys lived during trial, than with their biological parents.Â  The foster mother described the deteriorated
condition of both boysÂ teeth when they came under her care and their reticence
concerning hygiene.Â  Both boys also need
speech therapy and exhibited signs of developmental delay in their
intellectual, social, and emotional development.Â  The parentsÂ demonstrated poor judgment, the
constancy of their drug use, their association with McCurry and their having
allowed the boys to participate with him in panhandling, and the deplorable
condition of the home when CPS first became involved all cut against the
parents.Â  CPS caseworkers said the boys
needed specialized foster care and were responding very well to the foster care
they were receiving at the time of trial.Â 
Several of the Holley factors,
when applied to the facts of the instant case, point to the childrenÂs best
interests being served by termination of the parentsÂ parental rights.Â  

Â Â Â Â Â Â Â Â Â Â Â  We
consider the evidence sufficient to support a finding by a clear and convincing
evidence standard that the best interests of the children support termination
of the parent/child relationship. 

Review of Out-of-State Termination Not Necessary

Â Â Â Â Â Â Â Â Â Â Â  As
an additional basis for termination, the State also alleged (and the trial
court found) that the appellantsÂ parental rights to another child had been
previously terminated in West Virginia for conduct substantially equivalent to Section
161.001(1)(D) or (E) of the Texas Family Code.Â 
See Tex. Fam. Code Ann.
Â§ 161.001(M).Â  The appellants complain in
their third and fourth points of error there is nothing in the record
establishing that the applicable laws in West Virginia provide for the right to
trial by jury in termination proceedings and that the State failed to give
appellants adequate notice of this alleged ground for termination.Â  

Â Â Â Â Â Â Â Â Â Â Â  We
need not address these complaints, as we have found sufficient evidence to
support termination based on Section 161.001(D) and (E) of the Texas Family
Code.Â  Sufficient proof of one statutory
termination ground, in tandem with the finding that termination is in the best
interests of the children, is sufficient to support a termination order. Â In re
A.V., 113 S.W.3d 355, 361 (Tex. 2003).Â 
ÂIf multiple predicate grounds are found by the trial court, we will
affirm based on any one ground because only one is necessary for termination of
parental rights.Â Â K.W., 335 S.W.3d at 769.

Â Â Â Â Â Â Â Â Â Â Â  We
affirm the judgment of the trial court. 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice


Date Submitted:Â Â Â Â Â Â Â Â Â  August 10, 2011

Date
Decided:Â Â Â Â Â Â Â Â Â Â Â Â  September 2, 2011











[1]These
names are pseudonyms.Â  In a further
effort toward privacy, all references to the parents/appellants are made simply
as Âthe motherÂ and Âthe father.Â

Â 





[2]See Tex.
Fam. Code Ann. Â§ 161.001(D) (West 2011) .

Â 





[3]See Tex.
Fam. Code Ann. Â§ 161.001(E) (West 2011).

Â 





[4]See Tex.
Fam. Code Ann. Â§ 161.001(M) (West 2011).





[5]These
points of appeal, as stated, contain multifarious grounds.Â  Even allowing for the fact that the parents
have filed a joint appeal, they are complaining of multiple, distinct bases for
termination in each single point of error (one point of error assailing legal
sufficiency, one point factual sufficiency).Â 
A point of error is multifarious if it embraces more than one specific
ground of error. Â Mays v. State, 318 S.W.3d 368 (Tex. Crim. App. 2010). Â Nevertheless, in the interest of justice, we
will address the parentsÂ complaints. Â See Bell v. Tex. DepÂt of Criminal
Justice-Inst. Div., 962 S.W.2d 156, 157 n.1 (Tex. App.ÂHouston [14th Dist.]
1998, pet. denied).Â  However, considering
that the facts to support some of these claims are very difficult to separate into
neat categories and doing so would likely generate a great deal of duplicity,
the employment of technically multifarious is acceptable under these
circumstances.





[6]On
one occasion, in the presence of CPS investigator Kim Clough, Joshua defecated,
and proceeded to pick up and play with his feces.Â  The child acted as if this was normal
behavior.Â Â  

Â 





[7]McCurryÂs
testimony was not always clear or direct.Â 
He acknowledged having been charged with the crime of endangerment of a
child, as were both parents.Â  See Tex.
Penal Code Ann. Â§ 22.041 (West 2011).Â 
McCurry testified there was some discussion or agreement with the State
wherein he would receive some benefit in exchange for his testimony at the
termination proceeding.Â  At the motion
for new trial hearing, a judgment was admitted showing that pursuant to a plea
agreement, McCurry was sentenced to one year of incarceration for endangering a
child, stemming from the events at issue in the instant case.Â  McCurryÂs indictment alleges two counts, each
containing two paragraphs.Â  The record is
not clear whether the other count was dismissed.Â  In addition, evidence of several other
misdemeanor and felony convictions of McCurry were admitted at the new trial
hearing.Â  





[8]At
some point that afternoon or evening, while the parents were in their bedroom
using drugs, McCurry said he took the boys outside to play; they had played in
grey discharge water, possibly sewage, and McCurry took them into the bathroom
to clean them (though apparently not very thoroughly).Â  

Â 





[9]For
example, the parents apparently told the officers they had become ill from
eating something, which led them to fall asleep and thus not realize the boys
were gone.Â  The parents later
acknowledged smoking crack cocaine the night before making the police
report.Â  The parents did not testify, and
the chronology of events is gleaned from the testimony of the law enforcement
officers and McCurry.Â Â  





[10]Burton
was an employee of Family Focus Center.Â 
Burton said the agencyÂs Âprotective homemaker services consist of
modeling, teaching of home management, child care skills, locating access and
resources for children and families in their own homes as part of an ongoing
case plan.ÂÂ  

Â 





[11]Detective
Falco described the smell as a Âhorrible odor,Â a
Ârank, unclean odor of day-old grease or days-old grease.Â  . . . just a really bad odor.ÂÂ  He experienced this scent despite never going
completely in the house.Â  Mary Beth Gaddy, one of the boysÂ teachers, on one occasion visited
the home and noticed a ÂsourÂ odor from the house; the parents, she said, always
spoke to her on the porch.Â Â  





[12]At
least one of the clothing piles reached to the ceiling.Â  





[13]McCurry,
the family friend with whom the boys were initially found, said that on the
Friday night before he eventually took the boys to panhandle and was stopped by
police, there was nothing but pancake mix in the house, so he went to a store
and purchased chicken wings for the family.Â Â 






[14]Another
witness testified that at times the house also had no active electrical
service.Â  

Â 





[15]Although
many photographs were admitted to evidence during trial, none were sponsored by
or authenticated by Owens.





[16]Initially,
it appeared this statement was made about Samuel; but after a clarification, it
appears that she was describing Joshua, the only one of the boys with whom she
specifically worked.Â  Gaddy
said she only observed Samuel, the older boy, in his regular classroom, and he
was not GaddyÂs student.Â  





[17]The
mother told therapist Donna Mason, a licensed professional counselor, that her
brother had sexually assaulted her for years when she was a child.Â  Mason said that the mother also related that
her brother had also sexually assaulted one of the motherÂs children, but no
details of this abuse were provided.Â  Winstead also said he received a report from the boysÂ
foster parent that one of the boys may have been sexually assaulted.Â  Mason was very concerned at the lack of
judgment that the mother displayed whenÂÂdespite this history of sexual
abuseÂÂthe mother moved, apparently with the boys, next door to the
brother.Â Â  





[18]Mason
said that based on her interviews with father and mother, she was Âconfident,Â
the parents were not joking about the ghostÂÂthat both believed they saw and
heard ghosts in the home.Â  Mason was
concerned that the boys too evidently saw and spoke to the spirits.Â Â Â  





[19]Another
CPS investigator testified that although the parents were each ordered to make
child support payments following CPSÂs removal of the children from the home,
totaling about $417.00 a month, they had paid no support and spent about that
much each month on cigarettes.Â Â  





[20]As
regards the evidence of dogs defecating in the house, it appears the only
evidence of that was in the second house, i.e., the one where the parents were
living at the time of trial and where the boys had not lived.