Linda JONES, Appellant,

v.

**DALLAS COUNTY CHILD WELFARE UNIT, Appellee.**

No. 05–86–01159–CV.

Court of Appeals of Texas, Dallas.

Nov. 4, 1988.

Rehearing Denied Dec. 15, 1988.

Maxine T. McConnell, Stefan H. Krieger, Valli Joe Rowley, Joe F. Kolb and Layne Jackson, John M. Frick, Dallas, for appellant.

Timothy B. Counch, Terese M. Easter, Guardian Ad Litem, Dallas, for appellee.

Before WHITHAM, BAKER and KINKEADE, JJ.

KINKEADE, Justice.

Linda Jones appeals from the trial court's judgment terminating her parental rights to her sons, W____ and J____ P____ Jones. Although the judgment terminated the parental rights of both Mrs. Jones and her husband, Bruce Jones, Mr. Jones failed to perfect his appeal. Therefore, Mr. Jones is not a party to this appeal. In four points of error, Mrs. Jones asserts that the evidence was insufficient to support the verdict, that the trial court erred in refusing to submit a question to the jury on the efforts made by the Department of Human Services (DHS) to return the children to their parents, and that there was insufficient evidence that the DHS made reasonable efforts to make it possible for the children to return home. We disagree and, accordingly, affirm the trial court's judgment.

Involuntary termination of parental rights is governed by section 15.02 of the Texas Family Code. Section 15.02 provides in pertinent part:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

    \*    \*    \*    \*    \*    \*

(D) knowingly placed or knowingly allowed the child to remain in conditions

or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

    *     *     *     *     *     *

and in addition, the court further finds that

(2) termination is in the best interest of the child.

TEX.FAM. CODE ANN. § 15.02 (Vernon 1986). In order to terminate parental rights under section 15.02, there must be both a finding that the parent has committed one of the enumerated acts under section 15.02(1), and a finding that termination is in the best interest of the child. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex. 1984). Termination of the parent-child relationship involves fundamental constitutional rights. *Wetzel v. Wetzel,* 715 S.W.2d 387, 388 (Tex.App.—Dallas 1986, no writ). Therefore, the judgment must be based upon clear and convincing evidence. *Richardson,* 677 S.W.2d at 500. Clear and convincing evidence has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re S.H.A.,* 728 S.W.2d 73, 85 (Tex.App.— Dallas 1987, no writ).

In reviewing the evidence, the appellate court must determine whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. *Wetzel v. Wetzel,* 715 S.W.2d 387, 388 (Tex. App.—Dallas 1986, no writ). Mrs. Jones's points of error challenge the factual sufficiency of the evidence; therefore, we must consider all of the evidence to ascertain whether the clear and convincing standard has been met. *See In re S.H.A.,* 728 S.W. 2d at 86.

The record reflects that, in November of 1984, when the DHS first became involved in the case, Mr. and Mrs. Jones and their two children, W___ and J___ P___, were living in Grand Prairie, Texas. Mrs. Jones

and the children lived in a rent house while Mr. Jones usually stayed in a travel trailer which was kept in the yard. The Dallas County Child Welfare Unit of the DHS first contacted the Jones family in November of 1984. The school which W___ and J___ P___, attended made a referral call to the DHS, expressing concern for the boys' nutrition, hygiene, and medical needs. J___ P___ had been soiling himself two to three times a day. The school reported that it had received little cooperation from Mrs. Jones on these matters. On November 28, 1984, DHS intake case worker Cari Williams talked to W___ and J___ P___ at school. Williams and Ruth Woods, the school nurse, visited the Jones's house and discovered malodorous living conditions, including piles of garbage, dirty clothes, dirty dishes, and broken toys strewn everywhere. Several neighbors and social workers testified that the house was filthy, smelling of mold and urine. Leaves were several inches thick on the floor. Old newspapers, boxes and clothes were strewn around. Throughout the house, empty food containers, rusty cans and garbage were piled everywhere. At the time of William's visit, there was no edible food in the refrigerator; she found only molded containers which exuded a bad stench. Several windows were broken and, because it was wintertime, the house was freezing. The yard was cluttered with rusted tools and debris.

Woods testified, "I've done public health for thirty years, and I don't believe I have ever been in a more filthy home." Williams, who had visited over three hundred homes, testified that she had never come across a home that was so devastating, professionally and personally. Williams spoke to Mrs. Jones about the condition of the house and J___ P___'s need for medical attention regarding his soiling problem. Mrs. Jones, however, failed to follow any of Williams' suggestions for immediate improvement.

DHS ongoing case worker Greta Morgan made a home visit on January 22, 1985. Morgan found the house in the same deplorable condition as it had been the previ-

ous November. She testified that the septic system was not working and the toilet was filled with feces. Ms. Morgan made seven unsuccessful attempts to contact Mrs. Jones, by phone and in person, in January. The situation did not improve and, on March 28, 1985, the DHS filed a suit seeking to be appointed temporary managing conservator of W___ and J___ P___.

During the trial, witnesses testified that the children were often dressed inadequately for the weather. They also stated that the children wore dirty clothes, that they had a very bad body odor, and that their hair was matted with dirt. In addition to the physical problems, witnesses said that the children also exhibited severe behavioral problems. W___, a nine-year old whose intelligence level was above average, refused to do his school work. He often fought with other children and was withdrawn, depressed, and angry. W___ had expressed that at times he wanted to kill himself.

J___ P___, who was seven years old, behaved like a much younger child. His first-grade teacher testified that, because of his low self-esteem, he refused to even attempt school work. J___ P___ was much less verbal than other children his age. In class, he would become so angry and frustrated that he would throw things to the floor and cry a great deal. J___ P___ soiled his pants two to three times a day, which required that the school nurse or secretary take him, clean him up, and give him fresh clothes supplied by the school. A physician who had examined J___ P___ testified that the soiling had no physical cause, but was probably due to emotional problems.

Mrs. Jones testified that she loved her children, but felt overwhelmed by the responsibilities of working, keeping house, and caring for her family. She stated that her husband neither worked nor helped her with the house or the children. In Mrs. Jones's own words, she failed to keep her house clean herself because she is "lazy." She claimed not to have sufficient financial resources to provide her children with proper food, clothing or medical care, while at the same time she included in her list of fixed expenses money for dog food and rabbit food. When asked if she had sought medical help for J___ P___'s severe soiling problem, she replied in the negative and stated that it was not a priority of hers. Mrs. Jones admitted that she often became hysterical in front of her children, screaming and flapping her arms, and threatening to beat them to a pulp, or to kill them and herself.

In her efforts to retain the children, Mrs. Jones offered evidence that she worked full time delivering auto parts while she lived in Grand Prairie. Although she did not have a car, she voluntarily enrolled J___ P___ in a Headstart program and biked him to his class eight miles a day. When W___ made failing marks in the fourth grade, she insisted he repeat the grade, although the teachers would have allowed him to pass on to the fifth grade.

Although Mr. Jones is not a party to this appeal, he is still married to, and living with, Mrs. Jones. If the children are returned to Mrs. Jones, Mr. Jones will have a continuing influence and effect on W___ and J___ P___. Therefore, we must consider Mr. Jones's conduct.

Mr. Jones had previously served several tours of duty in the Army where he was trained as a mechanic. Despite his training, Mr. Jones was unemployed for about two years while living in Grand Prairie. Although Mr. Jones was home during the day, DHS caseworkers often found the children alone in the house. Mr. Jones would either not come out from his trailer when caseworkers visited the house or would simply walk away when questioned. Several witnesses testified that Mr. Jones did not interact with his children, but remained aloof. Mr. Jones's disciplinary methods were described by neighbors as brutal. Neighbors testified that they had observed one incident when Mr. Jones beat W___ with a belt. On another occasion, the school nurse discovered a large bruise on W___'s shoulder which W___ said was the result of punishment by his father.

Mr. Jones exhibited certain bizarre personality traits demonstrated by the letters he wrote to the DHS and to his sons. Several letters were written in what Mr. Jones claims is an American Indian language; others were written in Morse Code. In one letter to a DHS case worker, Mr. Jones responded to her report on the conditions of the Jones house and the family's situation as follows:

> So it was douring [sic] that time that we had no food, few cloths [sic], and bearly [sic] shelter. Since we had to eat we started hunting small rodents, birds, frogs, and what ever else we could eat. It was then I rembered [sic] that rodents thrived under the right conditions so I decided to create these conditions. Now after 2 years we aquired [sic] quite a taste for rodent and various birds. So even though we do not have to eat them any more we eat them becuse [sic] we like them. Now your repert [sic] stated there was no food in the house. Well there was plenty of food in the house you were just too unobservent [sic] to see it.

Expert testimony reveals that Mr. Jones's personality would not create a loving, nurturing environment for his children. As demonstrated by the testimony of his psychologist, Dr. Carl Newman, Mr. Jones perceived the world as "a threatening place and other people as being pretty hostile and punitive toward him." He was withdrawn, depressed and pessimistic. Because of his tendency to remain detached and separated, Mr. Jones's ability to attend to the needs of his children was impaired. As Dr. Newman testified, Mr. Jones viewed the random behavior of the children as hostile and reacted to the children in a punitive manner. At a court hearing, Mr. Jones stated that he did not want custody of his children, and that they would be safer if the DHS took them.

The testimony of the psychologists who tested the family shows a causal connection between the home environment and the abnormalities exhibited by the children. Dr. Jan Segal tested W____ and subsequently engaged him in therapy. Dr. Segal stated that W____ had displayed aggressive behavior, was sad and depressed, and had low self-esteem. For a time, W____ received medication to control his depression. Karen Fulbright, who worked with W____ and J____ P____ in sibling therapy, observed that W____ acted in the role of parent towards J____ P____, taking care of J____ P____'s needs before his own. Fulbright stated that such behavior is typical of neglected children. W____'s foster mother, Betty Jane Collins, testified that W____ had improved greatly in her home. She stated that W____ was more relaxed, happier, and was getting along with the other children. He was finally able to discontinue his anti-depression medication. However, Fulbright testified that W____ needs a consistent, nurturing family life in order to maintain his progress.

Fulbright was the primary psychologist who worked with J____ P____. Fulbright testified that J____ P____ was emotionally and intellectually delayed. He has a basic lack of trust in others, which is probably related to an impairment in his early attachment and relationship with his parents. While J____ P____ has the capacity to function normally, he needs a stable, structured, nurturing environment in order to develop optimally. J____ P____'s present foster mother, Virginia Lawson, testified that, since he has been in her home, J____ P____ has become loving and affectionate. He talks constantly and gets along with the other children in the home. The soiling problems have almost disappeared and the behavior of J____ P____ has become more appropriate for a child his age.

Although Linda Jones said that she wanted her children, she was unwilling or unable to properly care for W____ and J____ P____ while they were in her custody. Psychological tests show that she suffers from a severe paranoid schizophrenic personality disorder, which one psychologist, Nancy Hoke, determined may be untreatable. Hoke, who examined Mrs. Jones, testified that this personality disorder caused Mrs. Jones to be "extremely socially withdrawn and isolated. Personal relationships are often tinged with resentment, hostility, suspiciousness. Her behavior may be unpredictable." Mrs. Jones has

a difficult time attending to the needs or concerns of others because she is intensely self-focused. She blamed her problems on the outside world and took no responsibility for them herself. Hoke testified that a personality like Mrs. Jones's would exhibit poor parenting skills which would be very difficult to improve. Considering W____'s and J____ P____'s needs for a stable, nurturing environment, Hoke stated that Mrs. Jones would not be able to provide for them on a consistent basis.

During June and July of 1985, Morgan, the DHS ongoing caseworker, visited the Jones home several times. Morgan consistently found the children and the house in the same filthy condition. Morgan encouraged Mrs. Jones to apply for HUD housing, to seek protective day care for the children, and to attend psychological therapy. Mrs. Jones stated that she was not interested in HUD housing because she could not take her dogs. Mrs. Jones took advantage of the daycare, but the children had to discontinue their attendance because J____ P____'s soiling was disrupting the facility. In July of 1985, conditions at the Jones home worsened in that Mr. Jones was threatening to leave, and, in front of the children, Mrs. Jones was threatening to kill herself. At a hearing on July 25, 1985, Mrs. Jones had an hysterical outburst in court when Mr. Jones passed out and fell to the floor. Anne Packer, the Master at the hearing, testified that Mr. Jones had closed his eyes, and was moving his eyes back and forth under his eyelids, as if he was trying to put himself in a trance. At that time, the court ordered that the DHS take emergency possession of W____ and J____ P____. From then to the time of trial, the boys remained in separate foster homes.

In September of 1985, Mr. and Mrs. Jones moved to Garrison, Texas, near Nacogdoches, while the children remained in Dallas. They lived in their travel trailer on some property near Mrs. Jones's family. Mrs. Jones testified that she began psychological therapy in Nacogdoches, got on a waiting list for HUD housing, and began searching for parenting and homemaking classes. Carolyn Rawlings, a case worker for the Nacogdoches DHS, stated that the

Jones's trailer was clean on each of her several unannounced visits to the trailer.

While living in Grand Prairie, Mrs. Jones refused to cooperate with the DHS in improving her living situation or seeking psychological help. After the children were removed and Mr. and Mrs. Jones moved to Garrison, Mrs. Jones began attending therapy sessions. Her therapist, Sherry Hawthorne, testified that Mrs. Jones was making progress and could, with continued help, be a good parent. Despite this testimony, the evidence also shows that Linda Jones attended the therapy sessions sporadically. In July of 1986, a jury trial was held. A unanimous jury terminated Mr. and Mrs. Jones's parental rights to their sons.

■ In her first point of error, Mrs. Jones asserts that there was insufficient evidence that she exposed her children to dangerous conditions. A unanimous jury verdict found that Mrs. Jones had placed or allowed the children to remain in conditions which would endanger them physically or emotionally. The evidence in this case supports the jury's finding. Mrs. Jones stated that she loved her children, but her actions often failed to show that concern in that she refused to correct dangerous conditions affecting the children. She chose to continue the unsanitary conditions in the house and ignore the children's lack of proper hygiene. She failed to provide adequate clothing or heat during the winter, and left J____ P____'s medical problems untreated. The record reflects that these conditions did endanger the physical and emotional well-being of W____ and J____ P____. We hold that the evidence is sufficient to support the jury's findings. Mrs. Jones' first point of error is overruled.

■ In her second point of error, Mrs. Jones claims that there was insufficient evidence that she engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered the physical or emotional well-being of her children. "Endanger" as used in the statute means "to expose to loss or injury; to jeopardize." *Texas Department of Hu-*

man Services v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). The conduct creating the endangerment, however, need not be directed at the individual child. *See Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). That conduct does not necessarily have to occur in the child's presence in order to endanger the child. *Clark v. Clark*, 705 S.W.2d 218, 219 (Tex. App.—Dallas 1985, writ dism'd).

■ The evidence shows that Mrs. Jones often became hysterical; this conduct occurred in the courtroom, at her therapist's office, and in front of the children on several occasions. While the children were present, she threatened to kill herself and the children. Mrs. Jones's omissions regarding her failure to keep the house and the children clean are also evidence of conduct which endangers. She stated to a DHS worker that taking her children to the doctor when needed was not one of her priorities. Furthermore, Mrs. Jones allowed the children to remain alone in the house while she and Mr. Jones stayed in the trailer. Leaving two children under the age of nine alone overnight endangers their well-being.

Mr. Jones's erratic and dangerous conduct could also jeopardize the children. The evidence shows that he was brutal in his discipline and left bruises on W___'s body. By his own admission, the children were not safe with Mr. Jones. Aside from physical abuse, expert testimony shows that Mr. Jones's detachment from his children caused emotional problems for W___ and J___ P___. Any interaction Mr. Jones may have had with his children was likely to be inappropriate, as evidenced by the bizarre content of his letters to them and to the DHS. Mrs. Jones knew of Mr. Jones's undesirable conduct with the children and yet allowed them to remain alone with Mr. Jones. We hold that the evidence is sufficient to support the jury's verdict. Mrs. Jones's second point of error is overruled.

■ In her third point of error, Mrs. Jones argues that the trial court should have submitted a question to the jury regarding the reasonableness of the DHS's efforts to make it possible for the Jones children to return home. In point of error four, she questions the sufficiency of the evidence that DHS made reasonable efforts to make it possible for the children to return home.

Section 15.02 of the Texas Family Code sets out the requirements for involuntary termination of parental rights. Section 15.-02 does not require any efforts toward reunification of the family. The statute requires only proof of one of the statutory acts and proof that termination is in the best interests of the child. TEX.FAM. CODE ANN. § 15.02 (Vernon 1986). The plaintiff in an involuntary termination case is not required to make any attempt to help the parents or to ensure that the children can return home. *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 807 (Tex.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); *Moreland v. State*, 531 S.W.2d 229, 235 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ).

■ It is unclear whether the Dallas County Child Welfare Unit has a policy of providing services to a family to try to facilitate the return of the children. Even if this policy exists, however, it does not modify the requirements of the Texas Family Code nor create a condition precedent to the involuntary termination of parental rights. For these reasons, the trial court was correct in refusing to submit the requested jury question.

The DHS did provide the Jones family with a written service plan of improvement for the Jones family in September of 1985. This plan outlined the goals which Mr. and Mrs. Jones were to accomplish in order to secure the return of their children. Mrs. Jones, however, could not have acquired any substantive rights as a result of the proffered service plan because she and Mr. Jones refused to sign it. Once Mr. and Mrs. Jones rejected the offer of service, they could no longer complain that those services were never rendered.

The evidence shows that Mr. and Mrs. Jones refused most of the services that were offered to them by the Dallas DHS, such as psychological therapy and parenting classes. Mrs. Jones began attempting to comply with the service plan requirements only after her children were taken away and she moved to Nacogdoches. Furthermore, the evidence which was presented at trial regarding the services offered, and how Mrs. Jones responded to those offers of services, were before the jury under the issue submitted as to the best interests of the children. Points three and four are overruled and the trial court's judgment is affirmed.