**AFFIRMED and Opinion Filed August 5, 2022**



In the
**Court of Appeals**
**Fifth District of Texas at Dallas**

No. 05-22-00017-CV

**IN THE INTEREST OF M.H. AND H.H., CHILDREN**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30033-2020**

## MEMORANDUM OPINION

Before Justices Reichek, Nowell, and Carlyle
Opinion by Justice Carlyle

Mother and Father[1] appeal from the trial court's judgment terminating

parental rights to their children, M.H. and H.H., following a bench trial. Some, but

not all, of their issues on appeal overlap; we affirm in this memorandum opinion.

*See* TEX. R. APP. P. 47.4.

Twelve-year-old M.H. told her aunt that Father had sexually abused her. In

February 2020, the Texas Department of Family and Protective Services received a

referral, and M.H. gave a forensic interview. In the interview, M.H. revealed that

approximately ten days earlier, she woke up and went to Father's room to watch the

---

[1] Father adopted M.H. when she turned six. He is H.H.'s biological father.

news. M.H.'s sister, H.H., was asleep at the time. Father was in his bed under the covers, and told M.H. to shut the door. She sat on the edge of the bed and Father began scratching her back. Father then said, "I want to show you something." He asked if she wanted to see it, and she said, "No." Undeterred, Father removed the covers and showed her his "private part." She said that he was "squeezing it and rubbing it," and then "white stuff came out." Father told her, "This is what comes out of a male's private, and it makes girls pregnant." He grabbed some nearby blue-and-white underwear to clean up the "white stuff" from his stomach and then threw the underwear in the laundry basket.

When asked to describe Father's private part, she said "it was really long and had two balls under it." She also demonstrated a pumping action when describing what she meant by "squeezing" and "rubbing." Father told M.H. not to tell anyone about the incident because he could get in trouble. M.H. said she did not want Father to get in trouble, but felt she had to tell someone.

On a different day, M.H. said Father showed her "his private" again, but nothing came out of it that time. He grabbed her hand to try to make her touch it, but she did not let him.

Another time, Father asked her to pull up her shirt so he could see her "boobs." M.H. did not pull her shirt up, but Father touched her over the shirt. He asked her to pull her pants down so he could see her pubic hair. She refused, and Father got upset.

M.H. detailed another incident when she was playing a game on her phone in bed with both Father and H.H. Father began sending her messages on her phone asking if she wanted to know about male parts. Father then took his hand and began massaging her vulva on top of her shorts. He stopped when she told him to, but he made a noise suggesting he was unhappy. Although H.H. was there, she did not appear to notice what was happening.

M.H. also testified about an earlier time when she was at home and witnessed her maternal grandmother with Father's penis in her mouth. M.H. told Mother, and Father admitted to Mother that M.H. was telling the truth.

Michelle Lanier performed the forensic interview. She testified at trial that she believed M.H.'s outcry was credible. When asked to elaborate, she explained that M.H. was consistent in her statements; she was very detailed in describing what happened to her body; she often demonstrated by using her hands; she provided a lot of context, including a detailed timeline; she provided sensory details; she resisted opportunities to expand or exaggerate her allegations; and there were no red flags suggesting she fabricated her allegations.

Department investigator Brenda Martinez also testified at the trial. She said that when authorities told Mother about the outcry, Mother refused to believe it and insisted M.H. was lying. Mother said M.H.'s aunt must have encouraged her to make a false outcry because she was jealous of Mother's "good relationship" with Father.

Mother admitted, however, that Father had engaged in multiple extra-marital affairs and had engaged in oral sex with Mother's own mother. M.H.'s aunt had also accused Father of sending her lewd text messages, which Mother testified she did not believe despite the fact that Father admitted sending them.

After the forensic interview, police arrested Father and charged him with aggravated sexual assault of a child.[2] Detective Sarah Wittenburg testified that she viewed M.H.'s forensic interview and found it credible. In addition, police found M.H.'s journal, in which she wrote entries corroborating the allegations against Father.

A few weeks later, concerned that Father may have abused M.H. while she slept, M.H.'s aunt took her for a sexual assault examination. Her aunt conveyed the abuse allegations to the nurse practitioner performing the exam, Sandra Onyinanya. In addition, M.H. told Ms. Onyinanya that Parents sometimes spanked her to the point of causing bruises, and M.H. did not feel safe around Father because he hit her. She also reported having nightmares about Father getting out of jail and harming her. Ms. Onyinanya discovered no signs of physical trauma during the exam, which she noted was consistent with the vast majority of child sexual assault exams, and it did not rule out abuse.

---

[2] The case, from Collin County, no. 219-83772-2020, was dismissed the day of trial, June 30, 2022.

Mother testified at the trial that she did not believe M.H.'s outcry and would never believe it without physical proof. She said M.H. was prone to lying, and credited Father's explanation, that M.H. had walked in on him masturbating. Mother said she trusted Father because she did not "believe that he would have gone from someone older than him to someone younger." And she would have no reservations about allowing Father to be alone with either child, as long as it would not violate the conditions of his bond. Mother admitted she had initially thought M.H. was lying about Father having oral sex with her grandmother, although it ended up being true.

Concerning her plans for the children, Mother testified she was only interested in obtaining custody of H.H. because she could not trust M.H. in general or to be around H.H. Though she did not want M.H. returned to her, she did not want her parental rights terminated. She thought M.H. belonged in a treatment facility, although she had no plan for providing or paying for that treatment. She insisted she could "figure everything out."

With respect to H.H., Mother's plan was to have Father temporarily move out once she regained custody. Father would be "homeless for a while," living out of his car, but keeping his belongings at the family home. Mother thought Father should be able to visit H.H. under either her or her parents' supervision. And she thought she could be trusted to supervise the children because she would not do anything

that risked Father going back to jail. If H.H. were not returned to her, then she would continue living with Father.

Father asserted his Fifth Amendment rights when questioned at the trial. But he confirmed it was his position that M.H. was "lying about all of the allegations in this case." He also agreed with Mother's plan to have him live out of his car temporarily if she regained custody of H.H.

When trial resumed after a two-week break, Parents' plans had changed. Mother testified that, at her father's prompting, Father had recently moved in with her family in Canton. She acknowledged she was aware that one of the conditions on Father's bond was that he remain in Collin County or its contiguous counties, and she knew Canton was not in any of those counties. She said she did not know whether Father violated his bond conditions because she did not know what he discussed with his attorney. In any event, she reiterated that she did not believe Father is a danger to the kids, and did not trust M.H.

Other testimony at the trial included Ms. Martinez's observation that Mother was very cold towards M.H. during her visits, while being "warm, energetic, and playful with H.H." Ms. Martinez added that Mother did not attend one of the scheduled meetings with the Department because she was busy bailing Father out of jail. Though she acknowledged that H.H. was bonded with Mother, Ms. Martinez believed Mother had endangered both children by steadfastly supporting Father,

despite being aware of his sexually deviant behavior and M.H.'s allegations against him.

Counselor Amy Weems, H.H.'s therapist and M.H.'s former therapist, testified that M.H. felt betrayed when Mother did not believe her outcry. Ms. Weems believed M.H. was being honest about her allegations against Father, noting that M.H.'s description of the abuse was consistent and unwavering. She also believed M.H.'s behavioral issues, which included lying and stealing, were consistent with someone who had experienced trauma. With respect to H.H., she said H.H. is sad when she can't see her parents, and she definitely wants to return home.

M.H.'s current therapist, Dr. Sharon Mock, similarly testified that Mother's refusal to believe M.H. had traumatized her. She said M.H. does not want to return to Parents because she is both scared she would suffer further abuse and that Mother would not protect her.

Jessica Deany testified on behalf of CASA and expressed her belief that termination was in the best interest of both children because Father was sexually abusive and Mother refused to believe M.H.'s outcry or separate from Father. She noted that Mother would not cooperate in placing the children with family friends who might be willing to take them in because Mother did not want anyone to learn about the situation. Moreover, Mother said that if M.H. was ever going to come back

to live with her, she would have to rebuild Mother's trust. CASA was hopeful the children would be adopted.

Department conservatorship worker Estefanny Rodriguez testified on behalf of the Department that its plans for the children involved finding adoptive homes for each of them, and that she believed there was a good chance for adoption. She did not think Mother followed the court's order to maintain safe and stable housing because she allowed Father, who presented a danger to the children, to continue living at the home. Ms. Rodriguez was concerned that Mother would not report any further outcries and that she would give Father access to H.H. The Department expected Mother to develop a plan to protect the children and provide a home in which Father would not be allowed, to listen to the children, and to provide them with treatment and counseling. According to Ms. Rodriguez, although Mother completed her required services, Mother's steadfast support for Father, while ignoring M.H.'s outcry, endangered both children.

As for Father, Ms. Rodriguez testified it was the Department's position that Father endangered M.H. by grooming her for sexual abuse, by sexually abusing her, and by exposing her to sexual content. And although H.H. was not a direct victim, Father had endangered her as well because she was present in the same environment in which he abused M.H.

The Department believed termination was in both children's best interest—to protect them from abuse and to provide permanency through adoption. That said, given H.H.'s strong bond with her parents, the Department was willing to consider allowing her to have further parental contact post-termination.

At the conclusion of the trial, the court terminated both Parents' rights under subsections (D), (E), and (O) of family code section 161.001(b)(1). In explaining its reasoning, the court began by noting its confusion as to why they were litigating about M.H.: "I don't know why we were even here contesting [M.H.] when there is no parent here even asking for the child to be returned home, which is mind blowing in and of itself."

The court also found Mother's demeanor and testimony during the trial especially troubling:

> [Y]ou sit up there as a witness and it's okay that he and your mom were engaged in sexual activity. It's okay that things were going on between him and your sister. Apparently it's okay that things have gone on with him and your daughter. And the flat effect that you had, no emotion, no hurt, no anger, no nothing, you literally just sat up there like we were talking about what we had for lunch, which . . . either there is some severe mental illness that needs to be addressed or total denial or total fear, one of them, because that is not a normal response from any woman that hears these things or learns of these things.

The trial court followed up, expressing concern that it sounded like Mother had "just completely shut down." And given her refusal to believe any allegations against Father to which he did not confess, the court was worried Mother would not believe

any future outcries of abuse. It seemed to the court that the only person Mother was concerned about was Father, and there are "simply no boundaries at all" when it comes to Father's behavior.

The court also found it important that Mother waited until halfway through the trial to take any steps to provide a safe home environment for the children by having Father move out. And even then, it was not her idea. Moreover, Parents' plan was ill conceived because Father moved to "a county he's not supposed to be in[,] violating bond conditions, [and] jeopardizing going back to jail."

Ultimately, while acknowledging H.H.'s strong desire to return to Parents, the court concluded the children's safety was paramount, and termination was in each child's best interests.

THE EVIDENCE SUFFICIENTLY SUPPORTS TERMINATION

Parents first contend the evidence is legally and factually insufficient to support termination.[3] A trial court may terminate the parent-child relationship involuntarily only if it finds by clear and convincing evidence that: (1) one or more of the statutory grounds for termination enumerated in the family code has been established; and (2) termination is in the child's best interest. TEX. FAM. CODE

_____

[3] To the extent Parents argue as part of their sufficiency challenges that their attorneys were ineffective for failing to adequately cross-examine witnesses or present alternative factual theories, they have waived those issues by failing to adequately present them for our review. In addition to the multifarious nature of their sufficiency issues, Parents wholly fail to cite or apply any relevant authorities to support their conclusory assertions of constitutional ineffectiveness. *See* TEX. R. APP. P. 38.1(i); *Sprowl v. Stiles*, No. 05-18-01058-CV, 2019 WL 3543581, at *4 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.).

§ 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Because a court may terminate based on only one predicate finding under family code section 161.001(b)(1), we affirm if the evidence supports any of the statutory bases the trial court found. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). But where, as here, a parent challenges the sufficiency of the evidence supporting the trial court's findings under subsections (D) or (E) of section 161.001(b)(1), we must determine whether termination is supported under either or both of those grounds because of their potential collateral consequences on the parent's rights to other children. *See id.* at 235; TEX. FAM. CODE § 161.001(b)(1)(M).

Our standards of review in these cases reflect the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). Both legal and factual sufficiency reviews require us to review the evidence to determine whether the factfinder reasonably could have formed a firm belief or conviction that the grounds for termination were established. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). The difference between the two lies primarily in the way we consider evidence contrary to a finding. *Id.* at 630–31.

Our review of legal sufficiency requires us to view all the evidence in the light most favorable to the finding. *Id.* Thus, we assume the factfinder resolved all factual

issues in favor of the finding and disregard all disputed evidence to the contrary. *Id.* Our factual sufficiency review, in contrast, requires us to weigh the disputed evidence contrary to the finding and determine whether in light of the entire record the evidence that could not reasonably be credited in favor of the finding is so significant that it would prevent the formation of a firm belief or conviction that the finding is true. *Id.* at 631. In applying this standard, we must be mindful not to scrutinize the evidence to the point where "the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Section 161.001(b)(1)(D) requires that the parent "knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," and subsection (E) requires that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Both subsections require proof of endangerment, which in this context means "to expose to loss or injury or to jeopardize a child's emotional or physical health." *In re K.B.*, No. 05-19-00700-CV, 2019 WL 5485320, at *3 (Tex. App.—Dallas Oct. 25, 2019, no pet.) (mem. op.). It is not necessary, however, that the conduct be directed at the child or that the child is injured. *Id.* The primary distinction between the two subsections is the source of the child's endangerment. *Id.*

–12–

Subsection (D) focuses on whether endangerment results from the child's environment. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "Environment" refers to both the acceptability of living conditions and the parent's conduct in the home. *Id.* "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id.* "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.*

Subsection (E), in contrast, focuses on whether endangerment results directly from the parent's conduct, including the parent's acts, omissions, or failures to act. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). Subsection (E) termination must be based on more than a single act or omission; it requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.*

Child sexual abuse necessarily endangers a child's physical or emotional well-being. *See In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *12 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.). "[P]redatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered." *Id*; *see also In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San

–13–

Antonio 2012, pet. denied) ("Sexual assault of a child in the home is conduct we may infer will endanger the physical and emotional well-being of other children in the home who may either discover the abuse or be abused themselves.").

Parents contend the evidence merely shows a few instances where M.H. "walked in" on one or both of them engaging in sexual conduct. The trial court, as factfinder, was free to credit testimony concerning M.H.'s outcry, in which she alleged Father abused her directly on several occasions. In her forensic interview, M.H. alleged that Father intentionally: (1) rubbed her vulva over her clothing while H.H. was in the room; (2) masturbated in front of her; (3) asked her to remove her clothes; (4) touched her breasts over her clothing; and (5) exposed himself to her. This evidence alone sufficiently supports a conclusion that Father sexually abused M.H. on more than one occasion. *See Rodrigues v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991) (outcry testimony alone sufficient to support conviction beyond a reasonable doubt). Accordingly, the trial court could have formed a firm belief or conviction that Father knowingly allowed M.H. and H.H. to remain in conditions that endangered their physical or emotional well-being and that he engaged in a course of conduct that endangered them. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).[4]

---

[4] Because we conclude Father's termination was supported under subsections (D) and (E), we need not address his challenge to the trial court's findings under subsection (O). *See In re K.B.*, 2019 WL 5485320, at *4.

As for Mother, she steadfastly refused to believe M.H.'s outcry, despite the fact that allegations about Father's previous inappropriate sexual conduct with other family members had proved to be true. And M.H.'s counselors testified that Mother's refusal to believe M.H. traumatized her. Mother's intransigent "inclination not to believe the sexual abuse allegations demonstrates a pattern of endangerment to the emotional well-being of her children." *See In re S.R.M.*, No. 04-21-00168-CV, 2021 WL 4875538, at *5 (Tex. App.—San Antonio Oct. 13, 2021, no pet.) (mem. op.).

The record also reflects that Mother repeatedly placed Father's interests above the physical and emotional well-being of the children. Mother skipped a scheduled meeting with the Department so she could bail Father out of jail. She refused to cooperate with the Department in finding potential placements for the children out of fear her friends might learn about the allegations against Father. She refused, at least until the middle of trial, to take any measures to mitigate the danger to the children by agreeing to meaningfully limit Father's access to the family home—a prerequisite for the children's safe return. Even then, it was not her idea for Father to move out, and she made clear that she had no reservations about leaving Father alone with either child. On this record, the trial court could have formed a firm belief

or conviction that Mother engaged in a course of conduct that endangered M.H. and H.H.'s physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E).[5]

Parents also challenge the sufficiency of the evidence supporting the trial court's finding that termination was in the children's best interests. *See id.* § 161.001(b)(2). "Best interest" is a term of art encompassing a broad facts-and-circumstances evaluation and we accord the factfinder significant discretion in its best-interest conclusion. *In re L.J.H.*, 2021 WL 4260769, at *14. Although there is a strong presumption that maintaining the parent-child relationship serves the child's best interest, TEX. FAM. CODE § 153.131, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest, *id.* § 263.307(a).

In *Holley v. Adams*, the supreme court identified a nonexclusive list of factors potentially relevant to a best-interest determination, including: (1) the child's desires; (2) the child's current and future emotional and physical needs; (3) current and future emotional and physical dangers to the child; (4) the parental abilities of those seeking custody; (5) the programs available to help those individuals promote the child's best interest; (6) those individuals' plans for the child; (7) the home's or

---

[5] Because we conclude Mother's termination was supported under subsection (E), we need not address whether the evidence would also support termination under subsections (D) or (O). *See D.L.G. v. Tex. Dep't of Fam. & Protective Serv's*, No. 03-20-00314-CV, 2020 WL 6789208, at *6 (Tex. App.—Austin Nov. 19, 2020, no pet.) (mem. op.); *In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

proposed placement's stability; (8) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371–72 (Tex. 1976). An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. And the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest.

Here, the only *Holley* factor weighing in Parents' favor is H.H.'s strong preference to return to them, paired with testimony that H.H. would benefit emotionally from maintaining contact with them. But we must weigh this against the clear and convincing evidence of the danger Father posed, given his pattern of sexual abuse against M.H., and Mother's unwillingness to protect either child from that danger. *See In re S.R.M.*, 2021 WL 4875538, at *5 (mother's inclination not to believe her child's outcry and her continuing relationship with the sexually abusive father supported a firm belief or conviction that returning the children to mother would place the children in emotional and physical danger).

Further, there was testimony that the Department planned to give each child permanency in a safe adoptive home, that there was a good chance both children would be adopted, and that failing to terminate parental rights would deprive the children of that opportunity. *See In re C.J.B.*, 2019 WL 3940987, at *8 ("A child's

–17–

need for permanence is a paramount consideration in evaluating a child's physical and emotional needs."). On this record, the trial court could have formed a firm belief or conviction that termination was in the best interest of each child.

### THE TRIAL COURT DID NOT DEMONSTRATE EXTREME BIAS

Parents next contend the trial court violated their due process rights by abandoning its role as a neutral factfinder and making comments that illustrate significant bias against them. We review complaints about the administration of a trial for abuse of discretion. *See Chambers v. Pruitt*, 241 S.W.3d 679, 688 (Tex. App.—Dallas 2007, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

"All parties have a right to a fair and impartial trial before a neutral judge," *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.), who "should not act as an advocate for or adversary toward any party." *In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *2 (Tex. App.—Fort Worth June 27, 2019, orig. proceeding.) (mem. op.). "Allegations that a judge has put his or her thumb on the scale should not be made simply because a party disagrees with the judge's rulings." *In re E.M.*, 2019 WL 2635565, at *3. Judicial rulings alone "almost never constitute a valid basis for a bias or partiality motion," and the opinions a judge forms during a trial "do not call into question a judge's bias or partiality unless they

display a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re L.J.H.*, 2021 WL 4260769, at *2 (cleaned up). "Critical, disapproving, or even hostile judicial remarks" made to or about "counsel, the parties, or their cases do not ordinarily support a bias or partiality challenge." *Id.*

Parents cite numerous instances during the trial where they believe the trial court improperly assisted the Department in eliciting testimony and overcoming their objections, demonstrating judicial bias. We have reviewed the record, and we disagree. The trial court has broad discretion to conduct a trial, and it "may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time." *Id.* at *2–3. Indeed, the "trial judge has a duty to direct 'competent and material questions to a witness in order to clarify testimony or to elicit testimony that has not otherwise been brought out,'" and "such practice is 'especially proper' in a bench trial where the best interests of children are at issue." *Id.* at *3 (cleaned up). To the extent Parents complain about the trial court's comment that "there is no parent here even asking for the child, which is mind-blowing in and of itself," that reflects an opinion developed by the judge based on the evidence at trial, and it also does not show prejudicial bias. *See id.* at *2.

The record reflects the trial court acted within its broad discretion to expedite the bench trial by clarifying or explaining the basis of objections, by streamlining

–19–

testimony from witnesses, and by otherwise efficiently developing the factual record so it could make an informed decision in the children's best interests. *See id.* at 2–3.

### THE TRIAL COURT DID NOT ERR BY OVERRULING FATHER'S SPOUSAL-PRIVILEGE OBJECTIONS

Father next contends the trial court erred by admitting testimony of certain admissions he made to Mother, that Mother then conveyed to third parties, arguing that they are subject to spousal privilege. We review the trial court's evidentiary rulings for abuse of discretion and will not reverse unless an erroneous ruling likely led to an improper judgment. *See* TEX. R. APP. P. 47.1; *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020).

In general, a person has a privilege to refuse to disclose and prevent another from disclosing a confidential communication made by the person to his or her spouse. TEX. R. EVID. 504. But "[i]n a proceeding regarding the abuse or neglect of a child, evidence may not be excluded on the ground of privileged communication except in the case of communications between an attorney and client." TEX. FAM. CODE § 261.202. Here, the trial unquestionably involved the abuse or neglect of a child. *See Almendarez v. State*, 153 S.W.3d 727, 728 (Tex. App.—Dallas 2005, no pet.). Thus, even if we assume spousal privilege would otherwise protect the communications at issue despite their out-of-court disclosure to testifying third

parties,[6] they would not be subject to exclusion here. *See* TEX. FAM. CODE §§ 261.001(1)(E) (definition of abuse), .202; *see also In re L.E.S.*, 471 S.W.3d 915, 928 (Tex. App.—Texarkana 2015, no pet.) (holding spousal privilege did not apply in termination proceedings involving allegations of abuse or neglect).

### THE TRIAL COURT DID NOT ERR BY ADMITTING MS. ONYINANYA'S TESTIMONY

Mother next contends the trial court abused its discretion by admitting, over Father's hearsay objection, Ms. Onyinanya's testimony relaying statements made by M.H. and her aunt concerning the circumstances that prompted M.H.'s sexual assault examination. As an initial matter, Mother did not preserve this issue for appeal by objecting in the trial court, and she cannot rely on Father's objection to preserve this issue. *See In re C.U.D.*, No. 14-21-00427-CV, 2022 WL 711104, at *4 (Tex. App.—Houston [14th Dist.] Mar. 10, 2022, pet. denied) (mem. op.).

Regardless, considering the issue in the interests of justice, the evidence was admissible under the medical-diagnosis exception to the hearsay rule based on Ms. Onyinanya's testimony. *See* TEX. R. EVID. 804(3). Ms. Onyinanya's testified: "The most important purpose of a SANE examination is to . . . determine that the child's body is healthy, as well as to reassure the child that their body is healthy. And it is not, to do any labs, testing, and follow-up to treat that child medically." Ms.

---

[6] *See Jones v. State*, 859 S.W.2d 537, 540 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("The testimonial privilege 'does not prohibit evidence of out-of-court statements made by the witness-spouse.'" (quoting *Gibbons v. State*, 794 S.W.2d 887, 893 (Tex. App.—Tyler 1990, no pet.))).

Onyinanya also stated that the reason she gathers statements like the ones at issue is "for purposes of diagnosis and treatment," noting that the information "will help us determine, once again, what testing, what follow-up, and if there's any immediate needs on that day." Even had Mother preserved the issue for review, we would not conclude the trial court abused its discretion by admitting the testimony.

THE TRIAL COURT'S ERROR IN ADMITTING THE FORENSIC INTERVIEW VIDEO WAS HARMLESS

Parents next contend the trial court reversibly erred by admitting hearsay evidence of M.H.'s outcry. The only evidence parents specify as objectionable under this issue is the video of M.H.'s forensic interview that was admitted over Father's hearsay objection.[7]

According to the family code:

> In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and:
>
> (1) the child testifies or is available to testify at the proceeding in court or in any other manner provided by law; or
>
> (2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

---

[7] Because we conclude that the trial court's error in admitting the video was harmless, we need not decide whether Mother waived error by failing to object in the trial court.

TEX. FAM. CODE § 104.006.

The trial court admitted the statement, at the Department's urging, under family code section 104.002, despite our holding that section 104.002 does not permit admitting a child's videotaped statement in lieu of trial testimony. *See In re S.P.*, 168 S.W.3d 197, 209–10 (Tex. App.—Dallas 2005, no pet.). The Department appropriately concedes that, because M.H. was unavailable to testify at the trial, the trial court erred by admitting the video of her forensic interview without first holding a hearing and determining both that there were sufficient indications of reliability and that admitting M.H.'s statement in lieu of her testimony was necessary to protect her welfare. *See id.* But the Department contends the error was harmless, and we agree.

As noted, we will not reverse based on erroneously admitted evidence unless the error likely caused an improper judgment. *See* TEX. R. APP. P. 47.1; *Fleming*, 610 S.W.3d at 21. This usually requires a showing that the judgment turns on the erroneously admitted evidence. *In re D.A.C.-R.*, No. 05-21-00033-CV, 2022 WL 2303172, at *5 (Tex. App.—Dallas June 27, 2022, no pet. h.) (mem. op.). Generally, error is harmless if the same or similar evidence is introduced without objection. *See In re J.N.*, No. 05-14-00558-CV, 2014 WL 4978656, at *3 (Tex. App.—Dallas Oct. 7, 2014, pet. denied).

Here, Ms. Martinez provided a detailed affidavit describing the contents of M.H.'s forensic interview, and that affidavit came into evidence without substantive objection.[8] Neither Mother nor Father points to any relevant statements made by M.H. in her forensic interview that did not come into evidence elsewhere without substantive objection. And although we have recognized that video evidence often has a more powerful effect on jurors, *see In re S.P.*, 168 S.W.3d at 210, this case was not tried to a jury. Nothing in the record suggests the trial court's judgment turned on the distinction between the video and written evidence of M.H.'s outcry. Thus, on this record, we conclude the trial court's error in admitting the videotaped forensic interview was harmless.

### THE DEPARTMENT DID NOT HAVE THE BURDEN OF PROVING IT MADE REASONABLE EFFORTS TO RETURN THE CHILDREN

Finally, Parents contend we should reverse the trial court's judgment because the Department did not make reasonable efforts to return the children to their care. But Parents did not preserve this issue by presenting it first to the trial court and thus it presents nothing for our review. *See* TEX. R. APP. P. 33.1; *In re J.T.*, No. 02-14-00378-CV, 2015 WL 2345511, at *2 (Tex. App.—Fort Worth May 14, 2015, no pet.) (mem. op.).

---

[8] The Department introduced its original petition, which included Ms. Martinez's affidavit, into evidence at the trial. Father objected only that admitting the petition into evidence was unnecessary because it was part of the court's files.

In any event, the Department had no burden to produce any evidence on that issue. *See In re G.C.*, No. 11-12-00353-CV, 2013 WL 5520707, at *5 (Tex. App.—Eastland Sept. 26, 2013, no pet.) (mem. op.); *Jones v. Dallas Cnty. Child Welfare Unit*, 761 S.W.2d 103, 109 (Tex. App.—Dallas 1988, writ denied). Thus, the judgment would not be subject to reversal even if there were no evidence suggesting that the Department made reasonable efforts to return the children.

\* \* \*

Having overruled each of the parents' issues, we affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

220017f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF M.H. AND H.H., CHILDREN

No. 05-22-00017-CV      V.

On Appeal from the 199th Judicial District Court, Collin County, Texas Trial Court Cause No. 199-30033-2020.
Opinion delivered by Justice Carlyle. Justices Reichek and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 5th day of August, 2022.